# Illinois Official Reports

## Supreme Court

*In re Parentage of Scarlett Z.-D.*, 2015 IL 117904

| | |
|---|---|
| Caption in Supreme Court: | *In re* PARENTAGE OF SCARLETT Z.-D., a Minor (James R.D., Appellee, v. Maria Z., Appellant). |
| Docket No. | 117904 |
| Filed | March 19, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Du Page County, the Hon. Timothy McJoynt, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed. |
| Counsel on Appeal | David W. Schopp, of Aurora, for appellant. |
| | Camilla B. Taylor, of Lambda Legal Defense & Education Fund, Inc., of Chicago, for appellee. |
| | Robert F. Harris, Kass A. Plain and Mary Brigid Hayes, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Cook County Public Guardian. |
| | Winston & Strawn LLP (Samuel S. Park, of Chicago, and K. Joon Oh, of San Francisco, California), and John Knight, of Roger Baldwin Foundation of ACLU, Inc., of Chicago, for *amici curiae* American Civil Liberties Union *et al*. |
| | Hugh S. Balsam and Andy J. Miller, of Locke Lord LLP, of Chicago, for *amici curiae* Family Institute at Northwestern University *et al*. |

JUSTICE FREEMAN delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Thomas, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Scarlett Z.-D. is the adopted daughter of respondent, Maria Z. Petitioner, James R.D. (Jim), filed a petition in the circuit court of Du Page County seeking a declaration of parentage, custody, visitation, and child support regarding Scarlett. Prior to trial, the circuit court dismissed Jim's claims brought under common law contract theories and, following trial, denied his claims brought under functional parent theories. A divided panel of the appellate court (2014 IL App (2d) 120266-B) ultimately affirmed the rejection of Jim's common law contract and functional parent theories, but vacated in part the denial of Jim's claims and remanded for further fact finding with reference to the doctrine of equitable adoption as recognized in *DeHart v. DeHart*, 2013 IL 114137.

¶ 2    This court allowed Maria's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We hold that the doctrine of equitable adoption as recognized in *DeHart* does not apply to child custody proceedings. Accordingly, we now affirm the judgment of the appellate court in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4    In 1999, Maria and Jim met, fell in love, and began living together as a couple in Elmhurst. In 2000 or 2001, they became engaged to be married. Maria was born in Slovakia, immigrated to the United States, and frequently returned to Slovakia to visit family. During one such visit in early 2003, Maria met Scarlett, a 3½-year-old orphan. Born in June 1999, Scarlett was placed in an orphanage when her biological mother lost her parental rights.[1]

¶ 5    Through several telephone conversations, Maria and Jim decided to bring Scarlett into their lives. Under Slovakian law, Jim was not permitted to adopt Scarlett because he was neither a Slovakian national nor married to Maria. Accordingly, Maria and Jim decided that Maria would adopt Scarlett. Maria commenced the year-long adoption process and lived in Slovakia during that time. Jim financially supported the process, traveled there approximately five times, and participated in a psychological evaluation. In 2004, Maria adopted Scarlett under Slovakian law, and the three of them returned to the United States.

¶ 6    The circuit court found that Maria, Jim, and Scarlett lived together "as an intact family unit as if they were bound legally." Maria and Jim gave Scarlett the hyphenated form of their last names. Jim was the "father figure" to Scarlett, who referred to Jim as "daddy." Jim's name appears in Scarlett's school records as Scarlett's father. Jim paid all family expenses and provided economic support for Scarlett. In June 2006, he established a $500,000 irrevocable

---

[1]The custody evaluation report indicates that both of Scarlett's biological parents had been drug addicts. The record does not indicate any contact between Scarlett and her biological father.

trust for Scarlett. The court found that Scarlett "learned English and clearly came a long way over this time period under the watchful eyes and good parenting from both Jim and Maria."

¶ 7 However, Maria and Jim never married. Jim did not acquire legal recognition as Scarlett's father by domesticating the Slovakian adoption in Illinois, by seeking to adopt Scarlett pursuant to Illinois law, or by other statutory means.

¶ 8 The relationship between Maria and Jim deteriorated. In August 2008, Maria moved out of Jim's home, taking Scarlett. Later that month, Jim filed a petition for declaration of parental rights. In May 2009, Jim filed his second amended petition, which framed the instant proceedings. In the six-count petition, Jim sought: a declaration of parentage and an order granting him and Maria joint legal and physical custody of Scarlett, or alternatively, granting him primary custody with reasonable visitation for Maria (count I), and an equitable division of child support (count II). Jim also alleged several common law contract claims. Jim alleged that Maria breached their oral agreement to be equal parents to Scarlett (count III); he was therefore entitled to relief based on promissory estoppel (count IV); alternatively, in the absence of an express agreement, Maria breached their implied contract in fact (count V); or a contract implied at law (count VI).

¶ 9 Maria filed motions to dismiss pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2012)), contending that Jim lacked standing to commence a custody proceeding. The circuit court ultimately dismissed Jim's common law claims (counts III through VI) pursuant to section 2-615.

¶ 10 The case proceeded to trial. In count I, Jim alleged that he was Scarlett's *de facto*, equitable, and psychological parent, and that he stood *in loco parentis* to Scarlett. Maria filed a response, in which she raised the affirmative defense of standing. At the close of the trial, the court concluded that Jim lacked standing and was not subject to paying child support. Accordingly, the court denied relief under counts I and II.

¶ 11 On appeal, the appellate court initially affirmed. *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266. Jim filed a petition for leave to appeal with this court. We denied the petition, but entered a supervisory order directing the appellate court to vacate its decision and reconsider the appeal in light of *DeHart v. DeHart*, 2013 IL 114137, to determine if a different result was warranted. *In re Parentage of Scarlett Z.-D.*, No. 115000 (Ill. May 29, 2013) (supervisory order).

¶ 12 On reconsideration, a divided panel of the appellate court reversed the circuit court's denial of relief under counts I and II. The appellate court rejected Jim's assertion of standing based on various functional parent theories. 2014 IL App (2d) 120266-B, ¶¶ 33-50. However, the appellate court held that the equitable adoption doctrine as recognized in *DeHart* "might present a potentially viable theory of standing for Jim." *Id.* ¶ 64. The appellate court remanded the case to the circuit court with directions that the court make factual findings, with reference to *DeHart*, as to whether Jim could establish standing. *Id.* ¶¶ 65-68. Also, the appellate court again affirmed the dismissal of Jim's common law contract claims. *Id.* ¶¶ 74-76.[2]

---

[2]The partially dissenting justice would have vacated the circuit court's entire judgment and would have remanded the case for further proceedings regarding the issue of standing on all counts. *Id.* ¶¶ 81-94 (McLaren, J., specially concurring in part and dissenting in part).

¶ 13    Maria now appeals to this court. We granted the Family Institute at Northwestern University, Chicago Appleseed Fund for Justice, Family Equality Council and National Association of Social Workers, as well as the American Civil Liberties Union of Illinois and the National Center for Lesbian Rights, leave to submit *amici curiae* briefs in support of Jim. We also granted the Cook County public guardian leave to submit an *amicus curiae* brief. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). Additional pertinent background will be discussed in the context of our analysis.

¶ 14                                    II. ANALYSIS

¶ 15    Before this court, Maria assigns error to the appellate court's holding that the equitable adoption doctrine as recognized in *DeHart* might provide Jim with standing to seek custody of Scarlett. On cross-appeal, Jim assigns error to the appellate court's rejection of his claims. We address each of their respective contentions where appropriate in our analysis.

¶ 16                        A. Forfeiture of Objections to Standing

¶ 17    Jim first contends that Maria forfeited the opportunity to contest Jim's standing.[3] Maria filed a motion to dismiss Jim's petition pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)). She alleged that Jim's petition failed to state a cause of action because it did not address the threshold question of standing under either the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 (West 2012)) or the Illinois Parentage Act of 1984 (750 ILCS 45/1 (West 2012)). Jim filed a response, arguing that Maria had forfeited her standing argument because a section 2-615 motion was not the proper vehicle to raise the issue of standing.

¶ 18    The circuit court allowed Maria to file a memorandum in support of her section 2-615 motion if she so desired. Within the time allowed for that memorandum, Maria filed a section 2-619 motion to dismiss (735 ILCS 5/2-619 (West 2012)), asserting lack of standing under the Marriage Act. Jim moved to dismiss Maria's motion. He argued that Maria had forfeited the issue of standing by improperly raising it in a section 2-615 motion to dismiss. The circuit court found that Maria did not forfeit the issue of standing, and offered Jim additional time to submit affidavits and file a response to Maria's section 2-619 motion. Jim accepted the offer. The circuit court ultimately denied Maria's section 2-619 motion to dismiss regarding all counts of Jim's complaint. The court granted Maria's section 2-615 motion to dismiss regarding counts III through VI, but denied the motion regarding counts I and II.

¶ 19    Repeating his argument before the appellate court, Jim argues that Maria forfeited the issue of his standing by failing to file a "timely" section 2-619 motion to dismiss. The appellate court correctly rejected this contention. 2014 IL App (2d) 120266-B, ¶¶ 22-24.

¶ 20    A motion to dismiss under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)) tests the legal sufficiency of the plaintiff's claim, while a motion to dismiss under

---

[3]The appellate court used the term "waiver" because the parties did so. However, the court correctly recognized the distinction between waiver and forfeiture: " '[w]hile waiver is the voluntary relinquishment of a known right, forfeiture is the failure to timely comply with procedural requirements.' " 2014 IL App (2d) 120266-B, ¶ 22 n.3 (quoting *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320 n.2 (2008)).

section 2-619 (735 ILCS 5/2-619 (West 2012)) admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading that defeat the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31; *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002). A section 2-619 motion to dismiss must be brought "within the time for pleading." 735 ILCS 5/2-619(a) (West 2012). Lack of standing is an affirmative matter that is properly raised under section 2-619. *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999). Specifically, lack of standing under section 601(b)(2) of the Marriage Act is an affirmative defense that is forfeited unless raised in a motion to dismiss during the time of the pleadings. *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 486 (1999) (collecting cases).

¶ 21       We reject Jim's contention. Maria's section 2-619 motion was not "untimely" because she filed it well within the time for pleading and prior to evidentiary hearings. In any event, Maria based both of her motions to dismiss on Jim's lack of standing: either Jim's failure to plead standing (section 2-615), or Maria's affirmative defense of Jim's lack of standing (section 2-619). Thus, Jim does not, and cannot, argue that he was prejudiced by Maria's less-than-meticulous pleading. See *Wallace*, 203 Ill. 2d at 447; *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 483-88 (1994). Consequently, we uphold the appellate court's rejection of this argument.

¶ 22                                     B. Equitable Estoppel

¶ 23       In opposing Maria's motions to dismiss, Jim contended that Maria should be equitably estopped from challenging his standing to seek custody, visitation, and an allocation of child support. The circuit court rejected this contention, as did the appellate court. 2014 IL App (2d) 120266-B, ¶¶ 25-32.

¶ 24       The general rule is where A, by his or her statements and conduct, leads B to do something that B would not have done but for such statements and conduct, A will not be allowed to deny his or her words or acts to the damage of B. Equitable estoppel may be defined as the effect of A's conduct whereby A is barred from asserting rights that might otherwise have existed against B who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001).

¶ 25       To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel has been prejudiced by his or her reliance on the representations. *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000). The representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations. *Geddes*, 196 Ill. 2d at 314. The test is whether, considering all the circumstances, conscience and the duty of honest dealing should

deny one the right to repudiate the consequences of his or her representations or conduct. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986).

¶ 26    The party claiming estoppel has the burden of proving it by clear and convincing evidence. The availability of equitable estoppel depends on the circumstances of each case. *Geddes*, 196 Ill. 2d at 314. The circuit court's decision regarding equitable estoppel will not be disturbed on review unless it is against the manifest weight of the evidence, or will be reviewed *de novo* if it is based on a legal conclusion. *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33.

¶ 27    Applying these principles to the instant case, we conclude that the appellate court correctly rejected this contention for several reasons. Initially, there was no misrepresentation. As the appellate court observed, the record contains no evidence that Maria misrepresented to Jim that he was Scarlett's biological or adoptive father. Jim testified that, through 2006, he had initiated discussions with Maria about adoption every three to six months. Maria's response was always positive, but she did not act on his requests. Thus, Jim was aware at all times that he was not Scarlett's biological father, that the Slovakian adoption did not pertain to him, and that domestication of the Slovakian adoption or formal adoption in Illinois would be necessary as to him. Also, Jim testified that he and Maria intended that both of them would pursue adoption of Scarlett in this country. However, the court correctly stated that "a promise to do something in the future does not constitute a factual misrepresentation." 2014 IL App (2d) 120266-B, ¶ 28; see *Sinclair v. Sullivan Chevrolet Co.*, 31 Ill. 2d 507, 510 (1964) (stating that a misrepresentation, to be actionable, "must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening").

¶ 28    Assigning error to the appellate court, Jim attempts to base his equitable estoppel claim on then-existing circumstances rather than a future happening. Jim argues that Maria should be estopped from challenging his standing based on "her consistent course of conduct and express representations to Jim, Scarlett, and the outside world for years, on which both Scarlett and Jim reasonably relied, fostering a cherished parent-child bond that cannot be severed without causing psychological harm to the child and great injustice to Jim." According to Jim, "Maria's representation was her promise to protect and respect forever Jim's role in Scarlett's life as her 'Daddy,' and her years of conduct consistent with that promise, on which both Scarlett and Jim detrimentally relied."

¶ 29    We cannot accept Jim's argument. Maria's challenge of Jim's standing was in no way inconsistent with Jim's characterization of the circumstances. As the appellate court reasoned, Maria's conduct in treating Jim like Scarlett's father occurred when Maria and Jim were engaged to be married. Jim's relationship with Scarlett was contingent upon his relationship with Maria, Scarlett's only legal parent. For example, when asked what, if anything, he had done to secure United States citizenship for Scarlett, Jim testified that he, himself, could not do anything. He stated: "All I can do is work through Maria." Thus, when Maria and Jim terminated their relationship, Maria's assertion that Jim was not Scarlett's legal parent was not inconsistent with, or a repudiation of, her prior behavior. 2014 IL App (2d) 120266-B, ¶ 29. Again, there was no misrepresentation of a material fact.

¶ 30    Further, Jim could not have reasonably relied on his characterization of Maria's conduct. During their engagement, any words or conduct by Maria to encourage a relationship between Scarlett and Jim were gratuitous on Maria's part. A promise founded upon considerations of

affection or gratitude is a mere beneficence and cannot be the foundation for a legal action. See *In re Marriage of Engelkens*, 354 Ill. App. 3d 790, 798 (2004); *Lesnik v. Estate of Lesnik*, 82 Ill. App. 3d 1102, 1107 (1980); 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, Corbin on Contracts § 5.18 (rev. ed. 1995).

¶ 31    Moreover, Maria's conduct did not result in a fraudulent or unjust effect. Maria is Scarlett's legal mother. Parents have the fundamental right to make decisions regarding the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality opinion). "Encompassed within the well-established fundamental right of parents to raise their children is the right to determine with whom their children should associate." *Lulay v. Lulay*, 193 Ill. 2d 455, 473-74 (2000). Once Maria and Jim terminated their engagement, it was not unjust for Maria to refuse to allow custody or visitation between her daughter and her ex-fiancé.[4] We hold that Maria was not equitably estopped from challenging Jim's standing to seek custody, visitation, and allocation of child support.

¶ 32                              C. Functional Parent Theories

¶ 33    Jim next contends that the appellate court erred in holding that he may not state an equitable claim for custody, visitation, and support based on various functional parent theories. 2014 IL App (2d) 120266-B, ¶¶ 33-50. Jim argues that the circuit court found facts demonstrating his parent-child relationship with Scarlett. According to Jim, these facts permit him "to move forward with a claim in equity." If necessary, we review the circuit court's factual findings under a manifest weight of the evidence standard; however, we apply those facts *de novo* to the question of whether Jim has standing to pursue his custody petition. *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 486-87 (2010); *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535-36 (2010).

¶ 34    At the outset, Jim correctly concedes that he lacks statutory standing. Section 601(b)(2) of the Marriage Act provides that a nonparent may commence a custody proceeding, "but only if [the child] is not in the physical custody of one of [the child's] parents." 750 ILCS 5/601(b)(2) (West 2012). This section is a standing requirement for nonparents. "That is, for a nonparent to have standing to seek custody under the Marriage Act, the nonparent must first show that the child is not in the physical custody of one of his parents." *In re R.L.S.*, 218 Ill. 2d 428, 435 (2006). Further, "when used in this sense, 'standing' does not have the traditional meaning of a requirement that a litigant has a justiciable interest in a controversy. Rather, it merely refers to a threshold issue that must be determined before the court may proceed to a 'best interests' determination." *Id*. at 435 n.2; see *In re A.W.J.*, 197 Ill. 2d 492, 496-97 (2001).

¶ 35    The standing requirement of section 601(b)(2) of the Marriage Act safeguards the superior right of parents to the care and custody of their children. See *A.W.J.*, 197 Ill. 2d at 497. Indeed,

---

[4]Jim continues to rely on *In re Marriage of Schlam*, 271 Ill. App. 3d 788 (1995), in support of his equitable estoppel argument. However, *Schlam* is distinguishable. In that case, a husband and wife divorced and entered into a joint parenting agreement. The wife was equitably estopped from challenging the joint parenting agreement, in which she made representations to the court. In the case at bar, there is no marriage, divorce, or joint parenting agreement. Maria made no representations to the court regarding a father-daughter relationship. 2014 IL App (2d) 120266-B, ¶¶ 31-32 (distinguishing *Schlam*). The application of equitable estoppel in *Schlam* had nothing to do with either preventing a challenge to standing or a misrepresentation to the nonbiological father.

the superior right doctrine is of constitutional magnitude. The due process clause of the fourteenth amendment protects the fundamental right of parents to make decisions regarding the care, custody, and control of their children without unwarranted state intrusion. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000); accord *R.L.S.*, 218 Ill. 2d at 438; *Wickham v. Byrne*, 199 Ill. 2d 309, 316-17 (2002).

¶ 36    The Marriage Act does not define the term "parent." However, the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq*. (West 2012)) provides a statutory mechanism for legally establishing a parent-child relationship. *In re N.C.*, 2014 IL 116532, ¶ 51. According to section 2 of the statute, a "parent and child relationship" means the legal relationship between a child and his or her natural *or adoptive* parents, incident to which the law confers rights and privileges, or imposes duties and obligations. 750 ILCS 45/2 (West 2012). Section 4(3) provides that a parent and child relationship between a child and "an adoptive parent may be established by proof of adoption." 750 ILCS 45/4(3) (West 2012).[5] Section 14(a)(1) expressly directs the court to determine custody or visitation issues in accordance with the relevant factors in the Marriage Act. 750 ILCS 45/14(a)(1) (West 2012). These factors include the requirement of standing. See *In re Marriage of Mancine*, 2014 IL App (1st) 111138-B, ¶ 23; *In re Parentage of Unborn Child Brumfield*, 284 Ill. App. 3d 950, 954 (1996).

¶ 37    Accordingly, in the case at bar, Maria alone has a statutory parent-child relationship with Scarlett, as she is Scarlett's adoptive parent. Maria's Slovakian adoption of Scarlett was final. Domesticating the Slovakian adoption decree in Illinois would not elevate or improve Maria's status as Scarlett's legal mother. See Shelley B. Ballard, *Intercountry Adoptions: Avoiding Procedural Pitfalls and Common Problems*, in Illinois Adoption Law § 10.14 (Ill. Inst. for Cont. Legal Educ. 2011) (describing domestication of final foreign adoption as optional). However, Jim lacks statutory recognition as Scarlett's father. Accordingly, he is a statutory nonparent. Further, Maria has always retained physical custody of Scarlett. Consequently, Jim does not meet the standing requirement for nonparents provided by section 601(b)(2) of the Marriage Act.

¶ 38    Before this court, Jim nonetheless asserts that he is Scarlett's parent. Jim contends that he "is not foreclosed from bringing a claim for custody, visitation, or support simply because he lacks statutory standing." Jim argues that he can state a claim in equity based on several descriptions of "functional parent-child relationships." He alleged in count I: "Specifically, JIM is the *de facto*, equitable and psychological parent of, and stands *in loco parentis* to SCARLETT." In count II, Jim sought an allocation of child support so that he and Maria could "plan financially and make the best possible decisions to ensure SCARLETT's future."

¶ 39    Jim invokes an area of family law that continues to be debated in legal literature and to evolve in case law. As one scholar explains:

"Family law's acknowledgment of the importance of adults who are not parents, historically referred to as 'third parties' or 'legal strangers' to the child, has extended to the point that today functioning in a parent-like role can lead to becoming a parent. Although it remains clear that only parents possess the constitutional right to control

---

[5]An adoptive parent may establish the parent-child relationship also by records established pursuant to section 16 of the Vital Records Act (410 ILCS 535/16 (West 2012) ("Certificate of adoption")). 750 ILCS 45/4(3) (West 2012).

their children's upbringing, who counts as a parent has become increasingly complex. *** Adults who formerly might have been considered a legal stranger to a child may now be recognized by the law as having rights and obligations towards a child with whom they have no biological or formal legal connection. The case law employs various legal formulations to describe functional parents and differing tests to screen out who qualifies as a functional parent. *** Modern family law's 'functional turn' has exploded the notion that children have only two 'natural' parents who must be their sole caregivers, with the state as the only alternative in the absence of parents. This functional approach to the family exemplifies family law's ongoing efforts 'to reflect more accurately the reality of family life.' " Maya Manian, *Functional Parenting and Dysfunctional Abortion Policy: Reforming Parental Involvement Legislation*, 50 Fam. Ct. Rev. 241, 246-47 (2012).

Accord Pamela Laufer-Ukeles & Ayelet Blecher-Prigat, *Between Function and Form: Towards a Differentiated Model of Functional Parenthood*, 20 Geo. Mason L. Rev. 419, 421-23 (2013); Jeffrey A. Parness, *Federal Constitutional Childcare Interests and Superior Parental Rights in Illinois*, 33 N. Ill. U. L. Rev. 305, 309-10 (2013).

¶ 40    Courts and commentators have used several overlapping descriptions of functional parent, as did Jim here. Common to the definitions of "psychological parent" or "*de facto* parent" is a relationship with deep emotional bonds such that the child recognizes the person as a parent from whom the child receives daily nurture and guidance, independent of the form of the legal relationship. *In re E.L.M.C.*, 100 P.3d 546, 559-60 (Colo. App. 2004); *V.C. v. M.J.B.*, 748 A.2d 539, 550 (N.J. 2000). Whereas psychological or *de facto* parentage focuses primarily on the existence of a psychological relationship between the nonparent and child, the doctrine of *in loco parentis* focuses on whether the nonparent intentionally assumes parental status. A person who stands *in loco parentis* to a child has put himself or herself in the place of a legal parent by fully assuming all obligations incident to a parent-child relationship without going through the necessary formalities of a legal adoption. The rights, duties, and liabilities of such a person are the same as those of the legal parent. However, once the person alleged to be *in loco parentis* no longer discharges all duties incident to the parental relationship, that person is no longer *in loco parentis* and the parental relationship is terminated. *In re Destiny S.*, 639 N.W.2d 400, 406 (Neb. 2002) (collecting cases). Some courts have conflated the psychological parent, *de facto* parent, and *in loco parentis* doctrines and applied the four-prong test developed for *de facto* parentage: (1) whether the legal parent consented to or fostered the relationship between the *de facto* parent and the child; (2) whether the *de facto* parent lived with the child; (3) whether the *de facto* parent assumed the obligations of parenthood by taking significant responsibility for the child's care, education, and development, including contributing toward the child's support, without expectation of financial compensation; and (4) whether a parent-child bond was formed. *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 435-36 (Wis. 1995). These four factors cover the three-factor test for determining an "equitable parent" (*Atkinson v. Atkinson*, 408 N.W.2d 516, 519 (Mich. Ct. App. 1987)). See Emmalee M. Miller, Note, *Are You My Mother? Missouri Denies Custodial Rights to Same-Sex Parent*, 75 Mo. L. Rev. 1377, 1388-94 (2010); Jason C. Beekman, *Same-Sex Marriage: Strengthening the Legal Shield or Sharpening the Sword? The Impact of Legalizing Marriage on Child Custody/Visitation and Child Support for Same-Sex Couples*, 18 Wash. & Lee J. Civil Rts. & Soc. Just. 215, 242-46 (2012); Laufer-Ukeles & Blecher-Prigat, *supra*, at 422 n.9.

¶ 41 In addition to courts and commentators, the American Law Institute (ALI) has also contributed to this discussion. In 2002, ALI published its Principles of the Law of Family Dissolution: Analysis and Recommendations (Principles). Where state courts generally use the terms "psychological parent," "*de facto* parent," and "*in loco parentis*" interchangeably, the Principles distinguish these terms and assign them different meanings. Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03 (2002); see generally Beekman, *supra*, at 247-49; Laufer-Ukeles & Blecher-Prigat, *supra*, at 449-51; Robin Fretwell Wilson, *Trusting Mothers: A Critique of the American Law Institute's Treatment of De Facto Parents*, 38 Hofstra L. Rev. 1103 (2010).

¶ 42 In response to this legal evolution, state legislatures are providing statutory remedies. In fact, some legislatures have established parenthood gradations, such as with legal and equitable parents, or recognized childcare interests, such as with parental responsibilities and parenting time, in persons with neither biological nor adoptive ties. Parness, *supra*, at 310, 334-36. Some state courts, "while often sympathetic to nonbiological and nonadoptive parents, have deferred to elected legislators in their own state's 'representative democracy.' " *Id.* at 310. Our appellate court has concluded that standing to petition for custody or visitation is a complex issue that demands a comprehensive legislative solution. *In re Marriage of Simmons*, 355 Ill. App. 3d 942, 953-54 (2005); *In re Visitation With C.B.L.*, 309 Ill. App. 3d 888, 894-95 (1999). We agree.

¶ 43 Even advocates of a "functional parent" theory acknowledge the competing policy issues. For example, while observing that legal recognition of functional parents "generally has become more widely employed," and exhorting the recognition of "diverse family forms," one scholar acknowledges that:

> "functional definitions of parentage and recognition of third-party rights remain hotly contested in a number of jurisdictions. There are some who resist granting legal rights to functional parents and other third parties, particularly in the context of same sex families. Even scholars who favor more expansive definitions of parentage acknowledge that granting legal rights to third parties has costs to both parents and children." Manian, *supra*, at 248.

Further, the ALI's Principles, which recognize functional parenthood, also acknowledge the competing public policy issues:

> "Giving rights to de facto parents may serve to weaken the commitment society has to legal parents, on which the ideology of responsible parenting is based; yet disregarding their connection to a child at the time of family dissolution ignores child-parent relationships that may be fundamental to the child's sense of stability.
>
>    \*\*\*
>
>  The law's challenge is to identify an approach applicable to all cases that allows continued contacts by de facto parents whose participation in the child's life is critically important to the child's welfare and recognizes the importance that some families place on extended family, and yet is consistent with the autonomy of parents that is essential to their meaningful exercise of responsibility." Principles of the Law of Family Dissolution: Analysis and Recommendations, Introduction, at 5-6 (2002).

¶ 44 Our description of the several overlapping concepts of functional parenthood, which merely scratches the surface of the issue, reflects the extent of the many possible public policy

issues underlying Jim's one-sentence allegation. The relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of their underlying assumptions. The very difficulty of these policy considerations, and the legislature's superior institutional competence to pursue this debate, suggest that legislative and not judicial solutions are preferable. *Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 513 (1982); see *Hewitt v. Hewitt*, 77 Ill. 2d 49, 61 (1979).

¶ 45   In sum, Jim correctly concedes that he lacks statutory standing. Further, he cannot petition for custody, visitation, and support as Scarlett's "parent" because Illinois does not recognize functional parent theories.

¶ 46                     D. Applicability of Equitable Adoption Doctrine

¶ 47   Although the appellate court rejected Jim's functional parent theories to confer standing, the court held on reconsideration that the equitable adoption doctrine as recognized in *DeHart v. DeHart*, 2013 IL 114137, might confer standing on Jim to seek custody, visitation, and support of Scarlett. 2014 IL App (2d) 120266-B, ¶ 64. Maria assigns error to this holding.

¶ 48   Essentially, the doctrine of equitable adoption allows a person who was accepted and treated as a natural or adopted child, and as to whom adoption typically was promised or contemplated but never performed, to share in the inheritance of the foster or stepparent. *Estate of Ford v. Ford*, 82 P.3d 747, 750 (Cal. 2004); see 2 Am. Jur. 2d *Adoption* § 62 (2004).

¶ 49   *DeHart* was a model case for equitable adoption. That case involved an action against the executor of an estate to contest the decedent's will. The plaintiff, James DeHart, born in 1944, was held out to be the son of decedent, Donald DeHart, for James's entire life. Donald married James's birth mother when James was approximately two years old. She and Donald agreed that he would adopt James. This agreement was kept secret for the good of the family. Donald hired an attorney, received a purported birth certificate that named him as James's father, and believed that the adoption had been formalized and was legal. Throughout their lifetimes, both Donald and James used the purported birth certificate to conduct the affairs of life. However, in 2000, during the process of applying for a passport, James, then 56 years old, obtained his true birth certificate and first learned that he was not Donald's biological son. By then, James's mother was suffering from early-onset dementia and died in 2001. Even after this confrontation and the death of James's mother, Donald continued to hold out James as his son and executed a will leaving him an inheritance. However, the record contained no legal documentation of an adoption. *DeHart*, 2013 IL 114137, ¶¶ 3-7. Four years later, Donald remarried at age 83. His new wife, the defendant, was approximately 54 years old. The defendant allegedly exerted undue influence on Donald when he was not of sound mind. About one year later, Donald executed a will in which he stated that he had no children and bequeathed nothing to James. *Id*. ¶¶ 8-9.

¶ 50   When Donald died, the defendant was the executor of his estate, and she filed the second will in the circuit court. James contested the will in a complaint alleging testator incapacity, undue influence, fraudulent inducement, intentional interference with testamentary expectancy, contract for adoption, and equitable adoption. *Id*. ¶¶ 10-12. The circuit court granted the defendant's motion to dismiss James's entire complaint for failure to state a cause of action. The appellate court ultimately reversed the dismissal. *Id*. ¶¶ 13-14. This court affirmed the judgment of the appellate court. *Id*. ¶ 76.

¶ 51    Analyzing James's equitable adoption claim, this court concluded that "in Illinois an equitable adoption theory should be recognized under the right circumstances." *Id.* ¶ 58. Adopting the California Supreme Court's holding in *Ford*, we held that "a plaintiff bringing an equitable adoption claim must prove an intent to adopt along the lines described in *Ford* and, additionally, must show that the decedent acted consistently with that intent by forming with the plaintiff a close and enduring familial relationship." *Id.* ¶ 59.

¶ 52    We agree with Maria that the doctrine of equitable adoption, as recognized in *DeHart*, is a probate concept to determine inheritance and does not apply to proceedings for parentage, custody, and visitation. Certainly, the equitable adoption doctrine is "one example of the functional approach" in that it "looks beyond legal status and into the actual relationship that the individual shared with the decedent." Michael J. Higdon, *When Informal Adoption Meets Intestate Succession: The Cultural Myopia of the Equitable Adoption Doctrine*, 43 Wake Forest L. Rev. 223, 255-56 (2008). To that extent, it is not unlike the functional parent theories earlier rejected. However, the very definition of equitable adoption indicates its limited purpose. It is "a limited remedial doctrine devised by courts using their equitable powers" to permit such a child "to inherit by intestate succession from the child's putative equitably adopting parent(s)." Irene D. Johnson, *A Suggested Solution to the Problem of Intestate Succession in Nontraditional Family Arrangements: Taking the "Adoption" (and the Inequity) Out of the Doctrine of "Equitable Adoption"*, 54 St. Louis U. L.J. 271, 272 (2009). The doctrine is employed "[t]o correct the injustice that would result were the intestacy laws woodenly applied." Jan Ellen Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why?*, 37 Vand. L. Rev. 711, 767 (1984).

¶ 53    Since the doctrine of equitable adoption is merely an equitable remedy, "it is not intended or applied to create the legal relationship of parent and child, with all the legal consequences of such relationship, nor is it meant to create a legal adoption." Tracy Bateman Farrell, *Modern Status of Law as to Equitable Adoption or Adoption by Estoppel*, 122 A.L.R.5th 205, § 2(a), at 231 (2004); accord 2 Am. Jur. 2d *Adoption* § 63, at 784 (2004); *Titchenal v. Dexter*, 693 A.2d 682, 688 (Vt. 1997) (stating that equitable adoption does not alter the status of parties, but merely permits inheritance). Courts specifically have *not* applied the doctrine to give an equitably adoptive parent the right to custody or visitation of the equitably adopted child. Farrell, *supra*, at 231, 282-83 (collecting cases).

¶ 54    For example, *DeHart* did not involve a child custody proceeding, but rather a will contest. We explained the limited nature of our holding:

> "only in those cases where there is sufficient, objective evidence of an intent to adopt (or fraudulently or mistakenly holding out as a natural child on a continual basis), supported by a close enduring familial relationship, will an equitable adoption be recognized. The narrow nature of our holding forecloses claims against the estate of *any* foster parent or stepparent who merely treats a foster or stepchild lovingly and on an equal basis with his or her natural or legally adopted children." *DeHart*, 2013 IL 114137, ¶ 62.

Further, we expressly agreed with the *Ford* court's view of the doctrine. *Ford* involved a probate proceeding and defined the equitable adoption doctrine as a probate concept. *Ford*, 82 P.3d at 749-50. We hold that the doctrine of equitable adoption as recognized in *DeHart* is limited to the context of inheritance, and does not apply to child custody.

¶ 55     We also observe that, after citing many cases, Jim argues that regardless of whether the doctrine is labeled "equitable adoption, equitable parent, *de facto* parent, *in loco parentis*, or simply as derived from general principles of equity—these cases confirm that courts continue to have plenary authority in equity in matters affecting child custody, visitation, and support, irrespective of the separate authority provided by statute." Jim cited these cases before the appellate court, which adequately and correctly distinguished them. 2014 IL App (2d) 120266-B, ¶¶ 45-48. Lastly, Jim and supporting *amici* cite to many cases that recognize the various functional parent theories. However, decisions from our sister state courts are not binding on the courts of this state. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 489 (1989). Further, they are not persuasive because they do not reflect Illinois law.

¶ 56                                    E. Constitutional Arguments

¶ 57     Before this court, Jim argues that the denial of his claims "would violate [his] fundamental right as a parent. The due process guarantee of the state and federal constitutions protects relationships between children and their equitable parents as they do other parent-child relationships." Jim further argues that denial of his claims based solely on a lack of statutory standing "also would result in infringement on both Scarlett's and Jim's constitutionally protected rights to familial association and integrity," and also deny Scarlett equal protection. Jim also argues that granting him custody or visitation regarding Scarlett would actually respect "Maria's express agreement with Jim and her encouragement of Scarlett's understanding of Jim as her parent." The issue of whether an individual's constitutional rights have been violated is reviewed *de novo*. *In re A.W.*, 231 Ill. 2d 92, 106 (2008).

¶ 58     These constitutional arguments beg the question of whether Jim is a "parent" in the first place. Again, Jim concedes that he is a statutory nonparent. We have concluded that Maria made no representations to Jim that would estop her from challenging Jim's assertion of functional parenthood, and that Illinois does not recognize the functional parent doctrine. Jim cannot be denied due process by the denial of claims premised on a theory that Illinois does not recognize.

¶ 59     Further, Jim and Maria do not begin on equal footing regarding the care, custody, and control of Scarlett. As a fit custodial parent, Maria has the fundamental constitutional right to determine with whom Scarlett should associate. *Lulay*, 193 Ill. 2d at 473-74. She enjoys the presumption that her decisions to deny or limit visitation are in Scarlett's best interests. *Wickham*, 199 Ill. 2d at 318. The decision whether Jim's sought-after relationship with Scarlett would be in her best interests is for Maria to make in the first instance. *Id.* at 320 (quoting *Troxel*, 530 U.S. at 70). Of course, these constitutional rights are in no way lessened by Maria being a single parent. *Id.* at 318.

¶ 60     Regarding constitutional claims brought on Scarlett's behalf, since Jim was not Scarlett's legal parent or guardian, he is not within the class aggrieved by the alleged unconstitutionality. See *In re M.I.*, 2013 IL 113776, ¶ 32; *City of Chicago v. Lawrence*, 42 Ill. 2d 461, 464-65 (1969). Thus, Jim may not assert Scarlett's constitutional rights on her behalf. See *In re Marriage of Nienhouse*, 355 Ill. App. 3d 146, 153 (2004). We affirm that portion of the appellate court's judgment that upheld the trial court's denial of relief under counts I and II of

Jim's complaint based on lack of standing.[6]

¶ 61                              F. Contract Claims

¶ 62        Jim raised several contract claims in counts III through VI of his petition. The circuit court granted Maria's section 2-615 motion to dismiss, which the appellate court upheld. 2014 IL App (2d) 120266-B, ¶¶ 74-76. Before this court, Jim assigns error to the dismissal. Our review is *de novo*. *Patrick Engineering*, 2012 IL 113148, ¶ 31.

¶ 63        In count III, Jim alleged a cause of action for breach of an oral contract. See *Mannion v. Stallings & Co.*, 204 Ill. App. 3d 179, 186 (1990) (stating elements). In count IV, Jim alleged a cause of action for promissory estoppel. See *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51-52 (2009) (discussing elements). In counts V and VI, Jim alleged causes of action for a contract implied in fact and a contract implied at law. See *Century 21 Castles by King, Ltd. v. First National Bank of Western Springs*, 170 Ill. App. 3d 544, 548 (1988) (stating respective elements). Before this court, Jim contends that he properly pled these claims, none of which, according to Jim, "depend on any Illinois statute or a finding that [he] is a legal parent." We disagree.

¶ 64        This court has emphasized that "the character of the pleading should be determined from its content, not its label. Accordingly, when analyzing a party's request for relief, courts should look to what the pleading contains, not what it is called." *In re Haley B.*, 2011 IL 110886, ¶ 67; see *Aebischer v. Zobrist*, 56 Ill. App. 3d 151, 154 (1977) (stating that in determining legal significance of plaintiff's complaint court considers nature of relief sought rather than title of pleading); *South Side Trust & Savings Bank of Peoria v. South Side Trust & Savings Bank of Peoria*, 5 Ill. App. 3d 474, 479 (1972) (same).

¶ 65        Applying this principle to the instant case, we uphold the dismissal of counts III through VI. Although they sounded in contract, the relief sought in each count was a determination of custody, visitation, and child support. Accordingly, Jim's lack of standing defeats counts III through VI. To hold that these claims are valid would allow Jim to circumvent the statutory standing requirements.

¶ 66        We note Jim's reliance on *In re Parentage of M.J.*, 203 Ill. 2d 526 (2003) and *In re T.P.S.*, 2012 IL App (5th) 120176. In *M.J.*, this court held that the Illinois Parentage Act, which pertains to artificial insemination (750 ILCS 40/1 *et seq.* (West 2012)), did not prohibit a common law action for child support. *M.J.*, 203 Ill. 2d at 540. In *T.P.S.*, a panel of our appellate court held that the Illinois Parentage Act did not prohibit breach of contract and promissory estoppel claims. *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 41, 61.

¶ 67        We agree with the appellate court that these cases are inapposite. Neither decision recognized the equitable parent doctrine as a basis to assert standing to petition for custody, visitation, and support. Indeed, *T.P.S.* expressly held that Illinois does not recognize the equitable parent doctrine. *Id.* ¶¶ 64-65. Further, both decisions expressly limited their holdings to cases involving children born by means of artificial insemination. *M.J.*, 203 Ill. 2d at 541-42; *T.P.S.*, 2012 IL App (5th) 120176, ¶ 23; see 2014 IL App (2d) 120266-B, ¶¶ 42-44.

---

[6]Regarding count II, in which Jim seeks a determination of child support, nothing is preventing him from giving money to Maria for Scarlett's use.

- 14 -

¶ 68    We are not unsympathetic to the position of Jim, or even that of Scarlett. However, as Jim concedes, he lacks statutory standing to bring his claims for custody, visitation, and support. Legal change in this complex area must be the product of a policy debate that is sensitive not only to the evolving reality of "non-traditional" families and their needs, but also to parents' fundamental liberty interest embodied in the superior rights doctrine. See, *e.g.*, *Debra H. v. Janice R.*, 930 N.E.2d 184, 193-94 (N.Y. 2010); *Titchenal*, 693 A.2d at 689.

¶ 69    In sum, we affirm that part of the appellate court's judgment which upheld the dismissal of counts III through VI. We reverse that part of the appellate court's judgment which reversed the denial of relief under counts I and II.

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court of Du Page County is affirmed.

¶ 72    Appellate court judgment affirmed in part and reversed in part.

¶ 73    Circuit court judgment affirmed.