# Illinois Official Reports

## Appellate Court

---

### *Sweis v. Founders Insurance Co.*, 2017 IL App (1st) 163157

---

| | |
|---|---|
| Appellate Court Caption | SANA SWEIS, Plaintiff-Appellant, v. FOUNDERS INSURANCE COMPANY, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-3157 |
| Filed | December 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-006110; the Hon. Thomas P. Mulroy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John D. Chambers, of Vrdolyak Law Group, LLC, of Chicago, for appellant.<br><br>Stephanie Erickson, of Law Office of Shari Shelmadine, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1     The instant appeal arises from a lawsuit filed by plaintiff Sana Sweis against defendant Founders Insurance Company concerning underinsured motorist coverage[1] on plaintiff's automobile. The trial court granted summary judgment in favor of defendant, finding that plaintiff's suit was time-barred because the insurance policy required plaintiff to file her lawsuit within one year from receiving payment from the at-fault motorist. For the reasons that follow, we affirm the judgment of the trial court.

¶ 2                                    BACKGROUND
¶ 3                                    I. Complaint
¶ 4     On June 9, 2014, plaintiff filed suit against defendant; the complaint was amended three times, and it is the third amended complaint that is at issue on appeal. The complaint alleged that plaintiff was an insured under an automobile policy issued by defendant, which contained underinsured motorist coverage with limits of $100,000 for each person and required defendant "to pay all sums which the insured or her legal representative shall be legally entitled to recover as damages from the owner or operator of an underinsured motor vehicle, because of bodily injury sustained by the insured." The policy required defendant to pay the difference between the insured's compensatory damages received and the applicable policy limits.

¶ 5     The complaint alleged that on June 9, 2011, plaintiff was involved in a motor vehicle collision in which she sustained severe personal injuries. The at-fault motorist was covered for liability by an automobile insurance policy with a limit of $25,000, which was tendered on December 21, 2012. Beginning in January 2013, plaintiff's attorney and defendant's adjustor entered into negotiations. According to the complaint, "the adjustor *** represented to [the] attorney for Plaintiff *** that he had actual authority to negotiate all aspects of the claim including but not limited to extending the time to file suit as required under the policy as well as the dollar amount of the policy." The complaint alleged that plaintiff's attorney relied on the adjustor's authority based upon those representations.

¶ 6     The complaint alleged that "prior to December of 2013, [the] adjuster *** and Plaintiff's attorney agreed to extend the time to file any lawsuits as required under the policy until such time as Plaintiff and [defendant], by and through their actual and/or ostensible agent [the adjustor], no longer could finalize a settlement amount based upon Plaintiff's alleged injuries." The complaint further alleged that "after September 19, 2013, [the] Adjuster *** did in fact tell Plaintiff's attorney that a suit against [defendant] would not need to be filed before December 21, 2013 in order to continue efforts to resolve the claim." According to the complaint, "it was agreed between Plaintiff/Plaintiff's attorney and [the] Adjuster *** that once an impasse on settlement negotiations occurred, Plaintiff would then have one year to file suit."

¶ 7     The complaint alleged that, on February 10, 2014, the adjustor made an offer "with no indication that it was a final offer or that an impasse had been reached." According to the complaint, "Plaintiff did not file suit based on the representations of [the] Adjuster *** based

---

[1]Underinsured motorist coverage is insurance coverage on an insured's vehicle that provides coverage when the tortfeasor's insurance coverage is not sufficient to pay for the injuries sustained by the insured or passengers in the insured's vehicle.

upon the agreement that the parties had not reached an impasse in negotiations as agreed." The adjustor e-mailed plaintiff's counsel on April 25, 2014, "and inquired through email whether the case could be settled without Plaintiff filing the underlying complaint." According to the complaint, "[a]gain, Plaintiff relied on [the adjustor's] authority to enter into and continue negotiations on behalf of [defendant] with out [*sic*] having to file a lawsuit." Settlement negotiations continued until May 28, 2014, when the adjustor made a final offer, which plaintiff rejected. Plaintiff then filed her complaint on June 9, 2014.

¶ 8 The complaint alleged that plaintiff was entitled to her legally compensable damages between the $25,000 paid by the at-fault motorist and the underinsured motorist policy limits and that she timely filed suit due to the "tolling/waiver of the one year provision to file suit from the time of disbursement of the underlying tortfeasor settlement."

¶ 9 Attached to the complaint was a copy of the insurance policy. Part V of the policy concerned underinsured motorist coverage and contained a section entitled "Action Against Company," which provided, in full:

> "If any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of the underinsured motor vehicle because of bodily injury to the Insured, or do not agree as to the amount of payment which may be owing under this Part, then the matter or matters upon which such person and the Company do not agree shall be determined by legal action in a court of competent jurisdiction located in the county and state in which the Insured resides. Any action brought against the Company must be filed within one year from the date that the person claiming under this Part receives the last payment from an underinsured motorist or person at-fault in this occurrence."

¶ 10 The policy also contained a provision titled "Changes," which provided:

> "Notice to any agent or knowledge possessed by any agent or by any person shall not effect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized representative of the Company."

¶ 11 Also attached to the complaint was a copy of an e-mail sent from the adjustor to plaintiff's attorney. The e-mail was dated April 25, 2014, and provided:

> "Hi Pete,
>
> Just wanted to check on the status of this case. Do you think we can get it settled w/o you having to file suit?"

¶ 12                                   II. Motion for Summary Judgment

¶ 13 On May 26, 2016, defendant filed a motion for summary judgment, arguing that plaintiff's claim was time-barred by the one-year time limit set forth in part V of the insurance policy. Defendant argued that plaintiff's arguments concerning estoppel and tolling were unpersuasive because the evidence demonstrated that defendant had made no offer to toll the one-year limitations period set forth in the policy. Defendant claimed that defendant had made an offer to settle the matter in March 2013 to which plaintiff responded by filing a demand for arbitration. Defendant further noted that on September 19, 2013, the adjustor sent plaintiff's attorney a letter quoting the applicable provision of the insurance policy in response to

plaintiff's demand for arbitration and asked that plaintiff forward a copy of any complaint that plaintiff filed. Thus, defendant argued that "[p]laintiff's obligations under the policy of insurance were highlighted and expressed three months prior to the expiration of the time to file suit in this matter. [Plaintiff] was clearly not relying on this offer to delay proceeding in this matter. [Plaintiff's] action in filing a claim [with the American Arbitration Association (AAA)] shows [plaintiff's] intention to litigate this matter despite the offer to settle."

¶ 14   Attached to the motion for summary judgment was the transcript of the discovery deposition of plaintiff's attorney, who testified that he was unaware of when his office first received a copy of the insurance policy but that he read it for the first time the day before the deposition. Reading the applicable provision at the deposition, plaintiff's attorney admitted that plaintiff had received payment from the tortfeasor's insurance company but testified that plaintiff never received any payment from the underinsured motorist himself, so "there's still plenty of time to file the action." Plaintiff's attorney further testified that "based upon representations that [the adjustor] made to me, I was unaware of this one-year period of time at the time that I was trying to settle this matter with [him], and it was my understanding, based upon representations made to me, that if settlement negotiations broke down, that we would have to file a lawsuit. Now that I read this and I see this, and I didn't draft this. I think this was drafted by [defendant]. And I would say that there's plenty of time to file this lawsuit."

¶ 15   Plaintiff's attorney testified that plaintiff executed a release releasing the tortfeasor in exchange for payment of $25,000, which had been prepared by the tortfeasor's insurance company. Plaintiff's attorney further testified that he was the attorney who settled plaintiff's claim against the tortfeasor and that he initiated the claim for underinsured motorist coverage against defendant. When asked how he could do so without having a copy of plaintiff's insurance policy, plaintiff's attorney testified that he would have sent an "underinsured motorist notice" to the insurance company, which would typically respond by informing him of what the company needed in order to evaluate the claim. He was aware of the typical procedures for filing such claims through his experience "handling a lot of these cases for a long time."

¶ 16   With respect to his communications with the adjustor, plaintiff's attorney testified that his communications were memorialized through contemporaneous notes made by using Tort Pro software. The first time he had a conversation with the adjustor would have been on November 16, 2012, prior to the disbursement of the funds from the tortfeasor's insurance company. He again spoke with the adjustor on December 6, 2012, and then on January 30, 2013. According to the Tort Pro note from that day, plaintiff's attorney "demanded 50,000 fresh" and the adjustor indicated that he would call him back; the note also indicated that "[w]e will probably go through Triple A." Plaintiff's attorney testified that during that conversation, they "spoke about the value of the case, and we spoke about Triple A arbitration." The attorney next communicated with the adjustor on March 12, 2013, when he left the adjustor a voicemail in response to a call that he had received; the Tort Pro note associated with the voicemail indicated that the attorney "made a demand of $50,000." The attorney testified that the Tort Pro note was the only item in plaintiff's file that memorialized a $50,000 demand and that there was no written demand sent to defendant.

¶ 17   The next conversation between the attorney and adjustor occurred on February 19, 2014. The attorney testified that the Tort Pro note associated with that conversation disclosed that "[a]djustor is offering 10,000 fresh and then it's two dollar signs. He says: UIM policy requires

lawsuit against them, not Triple A." The attorney and adjustor engaged in e-mail correspondence on April 25, 2014, when the adjustor sent the attorney a message reading: "Just wanted to check on status of case. Do you think you can get it settled without having to file suit[?]" His next communication with the adjustor occurred on May 28, 2014, and the attorney testified that the Tort Pro note memorializing that conversation indicated that the "[a]djustor *** called and has only 11-12,000 in fresh money. Ben will file suit per policy."

¶ 18        The attorney testified that it was common practice to try to negotiate a settlement prior to filing suit.

¶ 19        The attorney testified that he was a supervisor of an associate attorney in the firm, and that by the time of filing suit, plaintiff's case was assigned to the associate; the attorney was unaware of the exact date on which the case was assigned to the associate but, looking at the file jacket of the plaintiff's file, observed that there was a handwritten note stating that the case was assigned to him on April 2, 2013. Plaintiff's attorney testified that he sent the April 25, 2014, e-mail from the adjustor to his assistant with instructions to forward the e-mail to the associate in his firm who was now handling the case.

¶ 20        The attorney identified a letter dated September 9, 2013, to defendant that was signed by the associate attorney, as well as a AAA demand for arbitration form. The attorney admitted that the arbitration demand form "was being filed because [the firm] intended on seeking recovery for [plaintiff] through Triple A arbitration." The attorney testified that he "general[ly]" reviewed demand for arbitration forms before they were sent out.

¶ 21        The attorney testified that he had "never seen it happen before" that an insurance adjustor would continue to attempt to reach a settlement on a claim after the potential for liability had expired. The adjustor never expressed to him that the time to file suit had expired, and the attorney "would have" expected the adjustor to do so. The attorney further testified that it was possible that there were other communications with the adjustor that were not memorialized in the Tort Pro notes. The attorney testified that it was his understanding that the adjustor was an agent of defendant and that, based on their conversations, "a lawsuit did not need to be filed until [he] and [the adjustor] reached an impasse in [the] negotiations." That impasse occurred on May 28, 2014, and the attorney instructed his associate to file suit at that point.

¶ 22        During further examination by defendant's counsel, the attorney admitted that, as an attorney, he did not rely on adjustors to interpret the language of an insurance policy and testified that "I didn't rely on *** his interpretation of the policy. I relied on his representations to me that we would make an effort to try to resolve the case prior to us filing a lawsuit." The attorney was unable to provide a specific date in which the adjustor had made that representation to him and admitted that he never confirmed in writing that plaintiff was not required to file a lawsuit until negotiations had ceased. The attorney testified that he was aware that the insurance policy stated that it could not be changed unless it was in writing and admitted that "regardless of what [the adjustor] may have said, [a change in the policy] had to be in writing in order for it to be effectuated."

¶ 23        One of the deposition exhibits, attached to the transcript, was a letter dated September 9, 2013, from the associate to the adjustor. The letter states, "Enclosed please find an AAA Demand for Arbitration relative to the above referenced case," and is followed by an AAA

arbitration demand form. Also attached as a deposition exhibit was a letter dated September 19, 2013, from the adjustor to the attorney.[2] The letter provided:

"Please allow this correspondence to act as a response to your letter dated September 9, 2013, wherein you enclosed an AAA Demand for Arbitration.

We ask that you withdraw your demand for arbitration as our policy states under Part V—Uninsured Motorist, Action Against Company:

If any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of the underinsured motor vehicle because of bodily injury to the insured, or do not agree as to the amount of payment which may be owing under this Part, then the matter or matters upon which such person and the Company do not agree shall be determined by legal action in a court of competent jurisdiction located in the county and state in which the insured resides.

Please forward me a copy of the complaint, once filed, to my attention.

Feel free to contact me directly *** with any questions."

¶ 24    Also attached to the motion for summary judgment was the transcript of the discovery deposition of the adjustor, who testified that he was a claims specialist with defendant. The adjustor testified that he would receive a claim through defendant's electronic system, review the claim, and discuss it with his manager, who would give him certain authority. At that point, he would attempt to settle the claim. In plaintiff's case, the adjustor dealt with the attorney to attempt to settle plaintiff's claim. The adjustor recalled that defendant had received a request to authorize plaintiff to accept a tender from the underinsured motorist's insurance company, which the adjustor reviewed with his manager, and the manager granted the authority to accept the tender. It was the adjustor's understanding that plaintiff did, in fact, settle with the tortfeasor for $25,000.

¶ 25    The adjustor testified that there was a note in plaintiff's file that the adjustor was authorized to offer plaintiff $12,500 in fresh money. The adjustor recalled that the attorney had demanded $50,000 to settle the claim and testified that he had offered the attorney $10,000.

¶ 26    The adjustor testified that he sent a copy of the policy to the attorney on April 3, 2013. The adjustor further testified that he sent a letter to the attorney on September 19, 2013, in response to a demand for arbitration and quoted a portion of the policy. The adjustor admitted that the quoted portion of the policy did not include the language about the one-year time limitation. He testified that the letter was a form letter drafted by using a template.

¶ 27    The adjustor admitted that he sent an e-mail to the attorney on April 25, 2014, asking if "we can get [the case] settled without you having to file suit?" The adjustor testified that the purpose of this e-mail was "[t]o try to get a response to [the September 19, 2013,] letter that I had sent to [the attorney]." The adjustor was then asked:

"Q. When you asked that question on April 25th of 2014, was it your understanding that [the attorney] would still be able to continue on with the claim by filing suit in the event you were unable to get the claim settled?

---

[2]We note that the salutation of the letter was directed to the attorney. However, the address block simply states the name of the firm and its Chicago address. The attorney testified that the associate worked out of their Chicago office, while the attorney worked out of the firm's south suburban office.

A. Not necessarily. I would say that he could file suit—he could file suit whenever—I mean, it's up to him if he wants to file suit or not. I don't know."

¶ 28 During examination by defendant's counsel, the adjustor testified that he did not have the authority as a claims specialist to modify the terms of an insurance policy, and he never indicated to the attorney that he had the authority to do so. The adjustor further testified that he never indicated that they could delay filing a lawsuit until a future date.

¶ 29 Attached to the adjustor's deposition transcript was a letter dated April 3, 2013, from the adjustor to the attorney, which provided:

"Per your request, enclosed please find a copy of our Insured's declaration page and copy of the policy. Please feel free to contact me with any questions."

¶ 30 In response to defendant's motion for summary judgment, plaintiff argued that the insurance policy was ambiguous. Plaintiff claimed that the policy did not state expressly that payment from the tortfeasor's insurance company would suffice to trigger the one-year time limitation for filing suit. Plaintiff further claimed that the policy did not specify the point at which an impasse occurs between the insurer and the insured, creating an ambiguity as to when the one-year time period began. Finally, plaintiff claimed that the adjustor's representations and continued negotiations led plaintiff to reasonably believe that the one-year time limit had not yet begun to run.

¶ 31 On September 21, 2016, the trial court entered a written order granting defendant's motion for summary judgment. The court found:

"The contract between Plaintiff and Defendant is clear and unambiguous. It provides that if there is a disagreement between the parties about underinsured motorist coverage, then dispute may be resolved through legal action. Next, the contract provides a one year time limit within which the Plaintiff could file her lawsuit, and the one year limit began on December 21, 2012 because that was the last time Plaintiff received a payment from the underinsured motorist. Plaintiff had until December 21, 2013 to file her lawsuit, but waited until June 2014.

Additionally, the contract states that any modifications to its terms must be memorialized in writing and signed by Defendant's representative. Therefore, Plaintiff could not have relied on any oral representations from [the adjustor].

Because the facts presented by the parties are not in dispute and the contract at issue is not ambiguous, Defendant's motion for summary judgment is granted."

¶ 32 On October 20, 2016, plaintiff filed a motion for reconsideration, which was denied on October 31, 2016. This appeal follows.

¶ 33                                                      ANALYSIS

¶ 34 On appeal, plaintiff argues that summary judgment should not have been granted. Plaintiff's arguments on appeal have some overlap but generally fall into three categories: (1) the language of the policy demonstrates that plaintiff timely filed suit, (2) plaintiff detrimentally relied on defendant's actions in failing to file suit within one year from the date of disbursement of the settlement from the underinsured motorist's insurance company, and (3) the inclusion of the one-year time limitation in the insurance policy violates public policy.

¶ 35 A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). " 'The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment.' " *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993)).

¶ 36    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 37                                    I. Terms of Policy

¶ 38    Plaintiff's first arguments concern the interpretation of the insurance policy itself. Specifically, plaintiff argues that the insurance policy is ambiguous as to when the time for filing suit begins to run. "An insurance policy is a contract, and the general rules governing the interpretation of contracts also govern the interpretation of insurance policies." *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 24. "A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement." *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). "Where the provisions of a policy are clear and unambiguous, they will be applied as written [citation] unless doing so would violate public policy [citation]." *Nicor*, 223 Ill. 2d at 416.

¶ 39    "Whether an ambiguity exists turns on whether the policy language is subject to more than one reasonable interpretation." *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). "That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its meaning." *Nicor*, 223 Ill. 2d at 417. "[W]e will not strain to find an ambiguity where none exists." *Hobbs*, 214 Ill. 2d at 17. "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Hobbs*, 214 Ill. 2d at 17.

¶ 40    In the case at bar, the provision of the insurance policy at issue was entitled "Action Against Company" and provided, in full:

> "If any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of the underinsured motor vehicle because of bodily injury to the Insured, or do not agree as to the amount of payment which may be owing under this Part, then the matter or matters upon which such person and the Company do not agree shall be determined by legal action in a court of competent jurisdiction located in the county and state in which the Insured resides. Any action brought against the Company must be filed within one year from the date that the person claiming under this Part receives the last payment from an underinsured motorist or person at-fault in this occurrence."

¶ 41    Plaintiff argues that this provision is ambiguous in two ways. First, plaintiff claims that the policy is unclear as to whether the time to bring suit is triggered by a payment by the tortfeasor himself or if a payment by the tortfeasor's insurance company is sufficient. Second, plaintiff claims that the policy is unclear as to when exactly the insurer and the insured will be deemed to reach an "impasse" as to payment so as to trigger the requirement that the insured file suit. We find both of these arguments unpersuasive.

¶ 42    Plaintiff's first argument concerns the policy language providing that "[a]ny action brought against the Company must be filed within one year from the date that the person claiming under this Part *receives the last payment from an underinsured motorist or person at-fault in this occurrence*." (Emphasis added.) Plaintiff argues that this language may be construed to mean that the payment must come from the underinsured motorist himself, rather than from his insurance company. This argument strains all credulity. By definition, an underinsured motorist is covered under an insurance policy. It is axiomatic—if one lacks insurance at all, he is "uninsured," not "underinsured." Indeed, the policy at issue in the instant case defines an "underinsured motor vehicle" as "a land motor vehicle or trailer of any type with respect to the ownership, maintenance or use *to which bodily injury bonds or insurance policies apply at the time of the accident*, but their limits for bodily injury liability are less than the limits of liability for this coverage." (Emphasis added.) Similarly, the Insurance Code defines an "underinsured motor vehicle" as "a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or under bonds or other security required to be maintained under Illinois law applicable to the driver or to the person or organization legally responsible for such vehicle and applicable to the vehicle, is less than the limits for underinsured coverage provided the insured as defined in the policy at the time of the accident." 215 ILCS 5/143a-2(4) (West 2010). Thus, there is necessarily an insurance company involved in order for the uninsured-motorist coverage to apply. In some cases, the tortfeasor may also contribute with his insurance company so the policy provision covers that instance in addition.

¶ 43    The purpose of such an insurance policy is to pay in the event of a collision for which the insured is liable. "Unlike other assets, a liability insurance policy exists for the single purpose of satisfying the liability that it covers. It has no other function and no other value." *People ex rel. Terry v. Fisher*, 12 Ill. 2d 231, 238 (1957); see also *Brown v. Advocate Health & Hospitals Corp.*, 2017 IL App (1st) 161918, ¶ 16 (quoting *Fisher*); *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 129 (2005)

("The principal purpose of this state's mandatory liability insurance requirement is to protect the public by securing payment of their damages."). An argument that plaintiff did not "receive[ ] *** payment from an underinsured motorist" because the funds came from the other driver's insurance policy rather than from the driver's own bank account is thus not persuasive.

¶ 44       Furthermore, such an argument is especially disingenuous in the instant case. Plaintiff executed a release dated September 20, 2012, in which she acknowledged the receipt of $25,000 in consideration for releasing the other motorist from all liability relating to the collision. Plaintiff cannot accept $25,000 in exchange for releasing all liability against the other driver while, in the next breath, arguing that she did not actually "receive[ ]" any money from the motorist. It is clear that the payment from the insurance company was made on behalf of the underinsured tortfeasor and this payment triggered the running of the one-year time period. In determining whether a policy contains an ambiguity, "[a]lthough 'creative possibilities' may be suggested, only reasonable interpretations will be considered." *Hobbs*, 214 Ill. 2d at 17. Plaintiff's argument is certainly creative, but it is not reasonable. This policy language is simply not ambiguous and must therefore be applied as written. Accordingly, the one-year time period began running no later than December 21, 2012, when plaintiff received payment on behalf of the tortfeasor.

¶ 45       We do not find plaintiff's argument about the other purported ambiguity to be any more persuasive than the first. Plaintiff argues that the policy does not specify the point at which it would be determined that there was a "disagreement" as to the amount owed to plaintiff such that plaintiff would be required to initiate an action against defendant. The relevant policy language provides that "[i]f any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of the underinsured motor vehicle because of bodily injury to the Insured, or *do not agree as to the amount of payment which may be owing under this Part*, then the matter or matters upon which such person and the Company do not agree shall be determined by legal action in a court of competent jurisdiction located in the county and state in which the Insured resides." (Emphasis added.) Plaintiff argues that the parties did not "disagree" over the amount owed under the policy until May 28, 2014, when the adjustor made a final offer that plaintiff rejected. We do not find this argument persuasive.

¶ 46       There is nothing in the policy to suggest that parties "do not agree as to the amount of payment which may be owing" only at the final point at which all settlement negotiations have been exhausted, and we cannot read such a restriction into the policy without any basis for doing so. "That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its meaning." *Nicor*, 223 Ill. 2d at 417. The language here is plain and unambiguous—plaintiff was required to file suit within one year of receiving payment from the tortfeasor if she and defendant did not agree as to the amount she was owed under the insurance policy.

¶ 47       Furthermore, in the case at bar, the record shows that the parties staked out their positions with respect to the amount owed to plaintiff early in the negotiations and deviated little from those positions—plaintiff sought $50,000, while the adjustor was authorized to offer only up to $12,500. There is no indication that the parties grew any closer to settlement throughout the course of the negotiations such that avoidance of a "disagreement" as to the amount owed would be likely. Thus, the claim that the parties did not "disagree" until May 28, 2014, is not

- 10 -

supported by the record. Finally, there is evidence in the record that plaintiff's counsel recognized that the parties were not moving towards an agreement well before the expiration of the limitations period—plaintiff demanded arbitration on September 9, 2013, over three months before the December 21, 2013, deadline to file suit. It is impossible to reconcile plaintiff's claim that the parties did not "disagree" over the amount owed to her when she sought arbitration over the dispute. In the case at bar, we cannot find that there was any ambiguity over when plaintiff was required to file an action against defendant. Accordingly, we find no basis for invalidating the one-year limitation for filing an action under the policy.

¶ 48        As a final matter, we note that at oral argument, plaintiff's counsel's ambiguity argument centered on a third purported ambiguity, namely, that the policy was ambiguous because it was not clear whether the time began running at the time of the settlement with the tortfeasor, at the time plaintiff's attorney received the payment on plaintiff's behalf, or when the payment was actually disbursed to plaintiff herself. This argument appears nowhere in plaintiff's brief and was made for the first time at oral argument. It is well settled that "[p]oints not argued [in the appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). Moreover, the only date contained in the record concerning payment indicates that the tortfeasor's insurance company tendered $25,000 on December 21, 2012. Plaintiff did not file her complaint until June 9, 2014, nearly one year and six months after that date. Plaintiff's counsel acknowledged at oral argument that it was unlikely that it would have taken another six months for the actual disbursement of the funds to plaintiff herself. Thus, even assuming that the time began running only when the funds were deposited into plaintiff's bank account, plaintiff's complaint was filed well over a year after that date. Consequently, any purported ambiguity would nevertheless result in an untimely complaint.

¶ 49                                    II. Equitable Estoppel

¶ 50        Plaintiff also argues that the one-year time limitation should not apply because her attorney relied on the representations of the adjustor to conclude that the time for filing suit had not yet passed. Plaintiff's argument is based on the theory of equitable estoppel. "The general rule is where A, by his or her statements and conduct, leads B to do something that B would not have done but for such statements and conduct, A will not be allowed to deny his or her words or acts to the damage of B. Equitable estoppel may be defined as the effect of A's conduct whereby A is barred from asserting rights that might otherwise have existed against B who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 24. " 'An insurer will be estopped from raising a limitations defense where its actions during negotiations are such as to lull the insured into a false sense of security, thereby causing him to delay the assertion of his rights.' " *Mitchell v. State Farm Fire & Casualty Co.*, 343 Ill. App. 3d 281, 285-86 (2003) (quoting *Hermanson v. Country Mutual Insurance Co.*, 267 Ill. App. 3d 1031, 1035 (1994)).

¶ 51        "To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel

reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel has been prejudiced by his or her reliance on the representations." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 25 (citing *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000)). "The test is whether, considering all the circumstances, conscience and the duty of honest dealing should deny one the right to repudiate the consequences of his or her representations or conduct." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 25 (citing *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986)).

¶ 52     In the case at bar, plaintiff argues that her attorney reasonably relied on the adjustor's representations that plaintiff could delay filing suit. The adjustor denied that he made these representations and there is no documentary evidence to support it. There are a number of problems with this argument. First, with respect to the first element of equitable estoppel, plaintiff must demonstrate that "the other party misrepresented or concealed material facts." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 25. "The representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive. Although fraud is an essential element, it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 25. In the insurance context, " '[c]ases in which an insurer's conduct is found to amount to estoppel typically involve a concession of liability by the insurer, advance payments by the insurer to the plaintiff in contemplation of eventual settlement, and statements by the insurer which encourage the plaintiff to delay filing his action.' " *Mitchell*, 343 Ill. App. 3d at 286 (quoting *Foamcraft, Inc. v. First State Insurance Co.*, 238 Ill. App. 3d 791, 795 (1992)). However, " '[t]he mere pendency of negotiations conducted in good faith is insufficient to give rise to estoppel.' " *Griffin v. Willoughby*, 369 Ill. App. 3d 405, 414 (2006) (quoting *Viirre v. Zayre Stores, Inc.*, 212 Ill. App. 3d 505, 515 (1991)).

¶ 53     In the case at bar, even if the adjustor made representations to the attorney that plaintiff could delay filing suit, it would not change our result because the attorney did not provide any evidence that the representations occurred prior to the termination of the limitations period or how long the alleged extension for the filing of a suit would occur. The attorney was asked during his deposition to provide the date of any such representations made to him and was unable to do so and also admitted that he was aware that "regardless of what [the adjustor] may have said, [a change in the policy] had to be in writing in order for it to be effectuated." Plaintiff makes much of the continued communication with the adjustor after the expiration of the limitations period, including a $10,000 offer, but the issue is whether there were representations made that prevented plaintiff from filing suit, and the evidence demonstrated that nothing prevented plaintiff from filing a timely lawsuit or obtaining a written agreement that the limitations period was to be extended. Consequently, we must consider communications between the parties that occurred prior to the expiration of the limitations period on December 21, 2013. Any communications made after that date would have no effect on whether plaintiff should have filed suit earlier. Since the attorney was unable to provide a time period when the adjustor told him that the limitations period was to be extended, there is simply no evidence in the record that the adjustor made any representations to plaintiff or her counsel prior to December 21, 2013, indicating that plaintiff was not required to file suit in accordance with the terms of the policy.

¶ 54     In fact, the evidence in the record shows just the opposite. The record shows that the adjustor sent the attorney a copy of plaintiff's policy on April 3, 2013, which would have

included the relevant policy language. Furthermore, the adjustor sent a letter to the attorney on September 19, 2013, expressly informing him that filing a complaint was the required method for dispute resolution, not arbitration.[3] While that letter did not contain the one-year limitation language, it did quote and highlight the language from the policy concerning the requirement of filing of a lawsuit and also asked the attorney to "forward *** a copy of the complaint, once filed." Thus, the adjustor expressly brought up the subject of filing suit three months prior to the expiration of the limitations period.

¶ 55    Furthermore, plaintiff cannot establish equitable estoppel because the record affirmatively contradicts any claims of detrimental reliance on the adjustor's purported misrepresentations. To establish equitable estoppel, plaintiff must demonstrate that her attorney "reasonably relied upon the representations in good faith to his or her detriment." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 25. In the case at bar, plaintiff's attorney filed a demand for arbitration while purportedly "relying" on the adjustor's representations that her attorney could continue negotiations without filing suit. Plaintiff does not explain how she can claim detrimental reliance in the face of such clear evidence that her attorney was *not* merely waiting for settlement negotiations to conclude before initiating dispute resolution proceedings. Moreover, as noted, in response to this demand for arbitration, the adjustor *expressly informed plaintiff's attorney that he was using the incorrect dispute resolution procedure and that he needed to file suit*. Again, this occurred several months before the expiration of the limitations period. "The party claiming equitable estoppel has the burden of proving it by clear and convincing evidence." *Scarlett Z.-D.*, 2015 IL 117904, ¶ 26. Here, we cannot find any evidence that equitable estoppel should apply.

¶ 56                                      III. Public Policy

¶ 57    Finally, plaintiff argues that the imposition of a one-year time limitation violates public policy because such a time limitation is not statutorily imposed and defendant does not highlight its inclusion to its insureds. While plaintiff frames both arguments as "public policy" arguments, the latter appears instead to be an unconscionability argument. "Although related, a finding that a contract provision is unenforceable because it is unconscionable is distinct from a finding that a contract provision is invalid because it violates public policy." *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60 (2011). Thus, we discuss the two arguments separately.

¶ 58    Plaintiff first argues that the imposition of a limitations period that is not prescribed by statute is against public policy. "If the policy language is unambiguous, the policy will be applied as written unless it contravenes public policy." *Lay*, 2013 IL 114617, ¶ 24. "In deciding whether an agreement violates Illinois public policy, we must determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest." *Country Preferred Insurance Co. v. Whitehead*, 2012 IL 113365, ¶ 28. "[T]he power to declare a private contract invalid on public policy grounds is exercised sparingly." *Whitehead*, 2012 IL 113365, ¶ 28. "Those who would invalidate an agreement carry a heavy burden of demonstrating a violation of public policy." *Whitehead*, 2012 IL 113365, ¶ 28. "An

---

[3]The attorney who testified he had not read the policy may have been of the belief that the underinsurance issue had to be resolved through arbitration. At that point in time, most insurance policies provided that disputes under underinsurance coverage could only be resolved in that manner.

agreement will not be invalidated unless it is clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy of Illinois, or unless it is manifestly injurious to the public welfare." *Whitehead*, 2012 IL 113365, ¶ 28. Such a determination depends on the particular facts and circumstances of the case. *Whitehead*, 2012 IL 113365, ¶ 28.

¶ 59    Our supreme court has noted that "[t]he parties to a contract may agree to a shortened contractual limitation period to replace a statute of limitations, so long as it is reasonable." *Whitehead*, 2012 IL 113365, ¶ 29. Thus, in *Whitehead*, the supreme court upheld an uninsured-motorist provision in an insurance policy that required that the insured make a demand for arbitration within two years from the date of the accident, even though the accident occurred in Wisconsin, which had a three-year statute of limitations for personal injury actions. *Whitehead*, 2012 IL 113365, ¶ 39. The supreme court noted that "the critical consideration, as we see it, is whether the two-year time limitation to which the insured and insurer agreed for dispute resolution procedures between them—which happens to correspond precisely with Illinois' two-year statute of limitations for filing a personal injury action—allows the insured sufficient time to ascertain the basis for, and dimensions of, her uninsured-motorist claim, and, if necessary, to take the steps, in accordance with the terms of the policy, to initiate dispute resolution procedures." *Whitehead*, 2012 IL 113365, ¶ 34.

¶ 60    "[U]nder Illinois law liability, uninsured-motorist, and underinsured-motorist coverage provisions are 'inextricably linked.' " *Rosen*, 242 Ill. 2d at 58 (quoting *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 404 (2010)). "[U]nderinsured-motorist coverage *** serves the same goal as uninsured-motorist coverage, '*i.e.*, to place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance.' " *Rosen*, 242 Ill. 2d at 69 (quoting *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 555 (1992)). Thus, our supreme court's analysis in *Whitehead* is helpful in our analysis, despite concerning uninsured-motorist coverage.

¶ 61    In the case at bar, plaintiff does not argue that the time period—namely, one year from the date of disbursement—is impermissibly short. Instead, she simply argues that the imposition of a contractual limitations period *at all*, where the legislature has not prescribed one by statute, violates public policy.[4] First, we note that while neither the Insurance Code (215 ILCS 5/143a-2 (West 2010)) nor the Illinois Safety and Family Financial Responsibility Law (625 ILCS 5/7-203 (West 2010)) provides for a statute of limitations, that does not mean that no statute of limitation applies. "In the absence of specific and clear provisions limiting the period within which suits must be filed, the 10-year statute of limitations for actions on written contracts is applicable to actions by insureds against their insurers based on insurance policies." *Whitehead*, 2012 IL 113365, ¶ 29. Moreover, plaintiff's argument has been expressly rejected by our supreme court in *Whitehead*. Accordingly, we find no basis in the record in this case for concluding that the imposition of a contractual limitations period is against public policy.

¶ 62    Furthermore, plaintiff provides no reason that the one-year time limit should be considered impermissibly short. Unlike other situations in which contractual time limitations have been enforced even though they require initiation of dispute resolution procedures triggered by the

---

[4]Plaintiff makes this argument without obtaining evidence from the Illinois Department of Insurance as to whether they approved this policy.

date of the accident, the time limit provided by the insurance policy in the instant case does not begin until "the date that the person claiming under this Part receives the last payment from an underinsured motorist or person at-fault in this occurrence." Thus, the time does not begin to run until the insured, in fact, knows that the payment by the other motorist is less than that provided by her own insurance policy. This adds a layer of protection to the insured that is not present in other cases in which time limitations have been upheld. See, *e.g.*, *Parish v. Country Mutual Insurance Co.*, 351 Ill. App. 3d 693, 699 (2004) (affirming dismissal of complaint where the insured did not become aware of the extent of her damages until after the two-year period for beginning dispute resolution proceedings against the insurer had expired); *Vansickle v. Country Mutual Insurance Co.*, 272 Ill. App. 3d 841, 842-43 (1995) (affirming dismissal of complaint where the other driver tendered payment more than two years after the accident, after the two-year time limitation for beginning dispute resolution proceedings under the insurance policy had expired); *Hannigan v. Country Mutual Insurance Co.*, 264 Ill. App. 3d 336, 343 (1994) (affirming dismissal of complaint where the insured did not become aware that the other motorist was underinsured until after the two-year contractual time limitation for beginning dispute resolution proceedings had expired). In the absence of any argument as to why the limitations period in this case was too short, we cannot find that it violated public policy.

¶ 63 Plaintiff also argues that the time limitation is against public policy because it "is only mentioned once in the entirety of the *** policy pamphlet, is never discussed with the claimant at any time, and *** is not specific as to when the time restraints would be imposed."[5] As noted, this represents a procedural unconscionability argument, not a public policy argument. "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of meaningful choice." (Internal quotation marks omitted.) *Rosen*, 242 Ill. 2d at 60. "Factors to be considered in determining whether an agreement is procedurally unconscionable include whether each party had the opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and all of the circumstances surrounding the formation of the contract." (Internal quotation marks omitted.) *Rosen*, 242 Ill. 2d at 60.

¶ 64 In the case at bar, plaintiff provides no reason for finding the time limit procedurally unconscionable. The provision is located in the part of the policy concerning underinsured motorist coverage, not added later as an exclusion, policy change, or endorsement, meaning that an insured would not need to search through the policy to find it. The provision concerning actions against defendant is also set off in a separate paragraph, not buried in a block of text, and is headed with a boldfaced heading stating "Action Against Company." This provision is also a single paragraph in length, not inordinately lengthy. As our supreme court has noted, this type of contract, which could be characterized as a contract of adhesion, is "a fact of modern life. *** It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable." *Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 26 (2006). Plaintiff also provides no authority for the proposition that an insurer is under an obligation to discuss every provision of the insurance contract with the insured. See *Babiarz v. Stearns*, 2016 IL App (1st) 150988, ¶ 43 ("It is well settled that plaintiffs bear the burden of knowing the

---

[5]We addressed plaintiff's arguments about the purported ambiguity of the language earlier in our analysis. *Supra* ¶¶ 45-47.

- 15 -

contents of their insurance policies."). In short, plaintiff has not demonstrated anything about this particular policy provision that would render it unconscionable, and as a result, we cannot find that it is.

¶ 65                                           CONCLUSION
¶ 66          For the reasons set forth above, the trial court properly granted summary judgment in defendant's favor. The language of the insurance policy was clear and unambiguous and required plaintiff to file suit against defendant by December 21, 2013. Since she did not do so, plaintiff's suit was time-barred and summary judgment was properly entered.

¶ 67          Affirmed.