**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 160355-U

Order filed November 5, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| | ) | Appeal No. 3-16-0355 |
| v. | ) | Circuit No. 14-CF-546 |
| | ) | |
| TRAVIEN K. MOORE, | ) ) | Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion by denying defendant's motion to continue the jury trial. Defendant received a fair trial, and the trial court did not err when imposing defendant's sentence.

¶ 2    In this case, the trial court denied defense counsel's motion to continue defendant's jury trial that was filed just three days before the scheduled trial date. Following the trial, the jury convicted defendant of five counts of aggravated criminal sexual assault, one count of aggravated

unlawful restraint, and one count of aggravated battery. The trial court sentenced defendant to an aggregate term of 105 years in the Illinois Department of Corrections. Defendant appeals.

¶ 3                                I. BACKGROUND

¶ 4        On December 5, 2014, the State charged Travien K. Moore (defendant), born September 5, 1987, by way of a 15-count indictment with aggravated criminal sexual assault, attempted murder, home invasion, armed robbery, armed violence, unlawful possession of a weapon by a felon, aggravated unlawful restraint, and aggravated battery.[1]

¶ 5        On December 12, 2014, the State filed several motions, including a motion for discovery, requesting a buccal swab specimen of defendant's DNA. On December 17, 2014, defendant's case was reassigned to assistant public defender Dawn Landwehr. Landwehr represented defendant throughout the entirety of the proceedings. On January 12, 2015, the trial court ordered that defendant submit himself for the collection of a buccal swab.

¶ 6        On February 10, 2015, the trial court set a jury trial date for May 4, 2015. The prosecution tendered the final DNA expert's report to defendant on March 26, 2015. On April 7, 2015,

---

[1]Counts I and II alleged defendant committed aggravated criminal sexual assault in violation of section 11-1.30(a)(8) of the Criminal Code of 2012 (the Code). 720 ILCS 5/11-1.30(a)(8) (West 2014). Counts III and IV alleged defendant committed aggravated criminal sexual assault in violation of section 11-1.30(a)(5) of the Code. 720 ILCS 5/11-1.30(a)(5) (West 2014). Counts V and VI alleged defendant committed aggravated criminal sexual assault in violation of section 11-1.30(a)(3) of the Code. 720 ILCS 5/11-1.30(a)(3) (West 2014). Counts VII and VIII alleged defendant committed aggravated criminal sexual assault in violation of section 11-1.30(a)(2) of the Code. 720 ILCS 5/11-1.30(a)(2) (West 2014). Count IX alleged defendant committed attempted first degree murder in violation of sections 8-4(a) and 9-1(a)(1) of the Code. 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014). Count X alleged defendant committed home invasion in violation of section 19-6(a)(3) of the Code. 720 ILCS 5/19-6(a)(3) (West 2014). Count XI alleged defendant committed armed robbery in violation of section 18-2(a)(2) of the Code. 720 ILCS 5/18-2(a)(2) (West 2014). Count XII alleged defendant committed armed violence in violation of sections 33A-2 and 12-3.05(a)(5) of the Code. 720 ILCS 5/33A-2 (West 2014); 720 ILCS 5/12-3.05(a)(5) (West 2014). Count XIII alleged defendant committed unlawful possession of a weapon by a felon in violation of section 24-1.1(a) of the Code. 720 ILCS 5/24-1.1(a) (West 2014). Count XIV alleged defendant committed aggravated unlawful restraint in violation of section 10-3.1 of the Code. 720 ILCS 5/10-3.1 (West 2014). Count XV alleged defendant committed aggravated battery in violation of section 12-3.05(a)(5) of the Code. 720 ILCS 5/12-3.05(a)(5) (West 2014).

defendant filed a motion to continue. At the April 14, 2015, hearing on defendant's motion to continue, defense counsel stated that she needed more time to prepare defendant's defense because she was "not real familiar with" the DNA material and had not had a DNA case for a long time. The State did not object, defendant's motion was granted, and the trial court rescheduled defendant's jury trial for August 24, 2015.

¶ 7        On August 18, 2015, the State requested a continuance on the basis that the victim had recently been diagnosed with a serious illness requiring treatment. The trial court granted the State a continuance and later scheduled the jury trial for November 16, 2015.

¶ 8        On November 10, 2015, defense counsel filed a Rule 413(d) disclosure informing the prosecution that defendant intended to assert that the alleged sexual activity between defendant and the victim was consensual.[2] Ill. S. Ct. R. 413(d) (eff. July. 1, 1982). On November 13, 2015, defense counsel filed a motion to continue the jury trial scheduled for November 16, 2015.

¶ 9        Defense counsel's written motion alleged that due to defense counsel's increased caseload, defense counsel lacked adequate time to prepare for trial with defendant, review, research, and file pretrial motions, and review the DNA evidence, which is not well understood by defendant or defense counsel. Defense counsel explained to the court that her primary reason for the requested continuance was due to uncertainty regarding the voluminous DNA evidence provided by the State in discovery. Defense counsel also informed the court that she needed more time to investigate allegations of a serial rapist who may have raped the victim after the victim had consensual sex with defendant. The trial court stated that presenting evidence of a potential serial rapist might create a trial within in a trial.

_____

[2]On the same date, defendant additionally disclosed the dates and locations of defendant's sexual contact with the victim pursuant to section 115-7 of the Code of Criminal Procedure. 725 ILCS 5/115-7 (West 2014).

¶ 10    The State objected to the continuance and advised the court that the victim was expecting to undergo surgery and begin chemotherapy in the near future for a serious illness. Once treatment began, the victim would be physically unable to testify for many months.

¶ 11    Before ruling, the trial court reviewed the chronology set forth in the docket sheets to shed light on the strength of defense counsel's argument. In doing so, the trial court noted that defense counsel had been appointed approximately one year earlier and the jury trial was originally scheduled for May 2015, based on defendant's right to a speedy trial. The court observed that defense counsel had done a lot of work on the case and filed a number of pretrial motions. The court commented that there was "a lot of action in terms of the number of hearings on this case. I had forgotten how many times we were in court really."

¶ 12    The court and the State agreed defense counsel received the final DNA report on March 26, 2015, and seven months later, on November 10, 2015, defense counsel filed a Rule 413(d) disclosure. This document informed the prosecution that the defense intended to assert at trial that the sexual activity between defendant and the victim was consensual.

¶ 13    The trial court was sympathetic and noted for the record that the public defender's office had recently become overburdened, and that assigned defense counsel just came out of a serious jury trial. The trial court stated:

"my understanding of why you need a continuance other than being tired, and I don't blame you and the defendant feeling as though he hasn't had enough time to see you recently cause you have been in trial, but what I note is you — this case has been vigorously defended by you over a period of many months.

I mean regrettably there are cases that I see that after many months there's actually not all that much has happened in court and there [*sic*] is not one of those cases. This is a

4

case that's been vigorously defended by you. You've been in court numerous times. The — you're saying now that you — after talking to your client you want — you want to get a DNA expert. What counters against that — what undermines the strength of that argument or claim is that you had the DNA evidence since March and there has — you — and you've not sought a DNA expert and on top of that you have filed a consent defense which really vitiates any concern about the accuracy of DNA. And, in fact,         you've listed four prior — three prior occasions — three occasions prior to the time of the offense that you want to introduce evidence or at least cross-examine the victim about having sexual activity with the defendant. So, you know, I don't see it."

¶ 14    After these observations, the trial court denied defendant's motion to continue, but strongly recommended the public defender's office provide defense counsel with additional assistance.

¶ 15    The jury trial began on November 16, 2015. During opening statements, the prosecutor made reference to the victim visiting her daughter, eating lunch with her mother, and visiting her aunt in a nursing home on the day the crimes took place. The prosecutor commented that the victim was "a religious woman" who "even went so far as to witness to" and "pray for" defendant. According to the prosecutor's opening remarks, defendant stated to the victim "I don't believe in your God" and referred to himself as "the devil." The prosecutor also utilized several descriptive words during opening statement including "terror," "horror," violence," "depravity," "brutal[ity]," "indignity," "savage" to describe the nature of the offenses. Defense counsel remarked during opening statement that the offenses were "awful," "a nightmare," "horrible," and "unbearable."

¶ 16    Following opening statements, the victim, who was 63 years old on November 10, 2014, testified and described her daily activities on that date to the jury. According to her testimony, that day the victim separately visited her daughter, her mother, and her aunt that was residing in a

5

nursing home. According to the victim, when she returned from her visits that day, she encountered a man in her home. The man had a gun and was wearing dark brown gloves, black pants, a black hoodie, and a black stocking cap with makeshift eye slits, pulled over his head. The victim described the man as black, about 5'11," 210 pounds, and about 27 years of age, though the man told her he was 35.

¶ 17 The man pointed a gun at the victim and told her that he would kill her if she screamed. The man told the victim to take off her clothing. The man placed his penis in victim's mouth and victim's vagina. After these acts, the man brought the victim to the shower and told the victim to place a bleach-soaked rag in her vagina. The victim touched the rag to her vagina but did not put it inside of her body as instructed.

¶ 18 The victim testified that she told the man that she was a Christian, that she forgave him, and that she would pray for him. The victim explained to the jury that she made these statements to the man because she "didn't know if he was gonna kill me or not[,]" "I was actually thinking I'm gonna lose my life." The victim stated that she was trying to comfort the man. In response, the man stated "he didn't believe there was a God[,]" "where is your God now[,]" and told the victim he was "the devil."

¶ 19 According to the victim's testimony, the man held his gun to the victim's head for four or five minutes before placing duct tape over her hands, ankles, and stuffing a sock in her mouth. The man also pulled a plastic bag over the victim's head and began choking her. The victim was unable to breath and believed she might suffocate.

¶ 20 Once the man left the victim's home, the victim screamed for help, and her neighbor came to her aid. Lastly, the victim testified she had never met defendant before the day in question, and stated she was not having a sexual relationship with defendant prior to the date of the incident.

¶ 21    Jessica McManimen, a registered nurse trained as a sexual assault nurse examiner, examined the victim at the hospital immediately following the incident. The nurse noted injuries to the victim's wrists, ankles, shoulder, back, and vagina. The nurse collected a rape kit including a vaginal swab.

¶ 22    Katherine Sullivan, a forensic biologist with the Illinois State Police, testified and described at length how she conducted a DNA analysis, and provided that she used the victim's vaginal swab to perform a DNA analysis. Sullivan obtained one male and one female DNA profile from the vaginal swab. The male profile was compared with DNA in a database of known profiles which resulted in a preliminary match with defendant.

¶ 23    The buccal swab taken from defendant was also analyzed subject to DNA analysis by Sullivan. Sullivan compared the male DNA profile from the buccal swab to the male DNA profile from the vaginal swab and confirmed both matched. According to Sullivan, a statistical analysis on the male DNA profile identified in the vaginal sample "would be expected to occur in approximately 1 in 25 quintillion black [individuals], one in 21 sextillion southwest Hispanic [individuals], [and] one in 780 quintillion white unrelated individuals.

¶ 24    During closing argument, the prosecutor made references to the victim's family, friends, and her activities on the day of the crimes. The prosecutor utilized the terms "humiliation," "ultimate indignity," "horrifying," "terror," *inter alia*, to describe the crimes. The prosecutor spoke of the victim's belief in God, her assurance to defendant during the attack that she would pray for him, and the victim's statement that she had forgiven defendant. The prosecutor also observed that defendant told the victim he did not believe in God and claimed to be the devil. The prosecutor described defendant as a self-proclaimed devil who self-identified with the very embodiment of evil. The prosecutor stated that "the only thing necessary for the triumph of evil is for good men

7

to do nothing. So I ask you, good men and women of this jury, as this case leaves our hands and head[s] into yours, what are you going to do?"

¶ 25        The prosecutor stated:

"[the victim] who was 63 years old on November 10th of 2014 described to you that the first thing she saw was a silver gun or a firearm. While holding that gun he ordered her to take her clothes off and suck his erect penis. He then moved on to order her on her back, her stomach and ultimately on all fours where each time he penetrated her vagina with his penis. When he forcibly placed his penis in [the victim's] vagina she told you she hurt. The Defendant caused bodily harm to [the victim] during the sexual assault. The bodily harm to her vagina is considered bodily harm not only for the penis-vagina count but for the penis-mouth charge as well. The bodily harm to her vagina was part of a continuous unbroken series of events calculated by this defendant. The cutting off of her breathing and the Defendant tying her up so tightly that she couldn't move also qualify as bodily harm because those things were also done during the series of assault upon her by the Defendant."

¶ 26        The prosecutor also stated:

"Finally, the Defendant has been charged with aggravated unlawful restraint. We must prove that the Defendant detained [the victim] while armed with a dangerous weapon, in this case the firearm. The Defendant detained [the victim] when he duct taped her hands and her ankles while he had the gun. We believe that the evidence has shown that we have proven all of the charges against the Defendant."

¶ 27        During closing argument, defense counsel described the evidence as unbearably awful and stated "[the victim] testified here and she told you how she made it through. Soft talking, prayer

8

and intuition about what not to to [*sic*]." Defense counsel argued it was not disputed that the victim had been assaulted but stated the State's evidence did not establish his client was the attacker.

¶ 28 The jury found defendant guilty of five counts of aggravated criminal sexual assault (counts 3, 4, 5, 6 and 7), one count of aggravated unlawful restraint (count 14) and one count of aggravated battery (count 15). The jury acquitted defendant of aggravated criminal sexual assault and attempted murder as charged in counts 8 and 9.

¶ 29 The jury was unable to reach a unanimous verdict on the six remaining counts requiring proof of the use of a firearm or handgun. The court declared a mistrial on those six counts.

¶ 30 On February 8, 2016, defense counsel filed motions for a judgment notwithstanding the verdict and for a new trial arguing, *inter alia*, that the evidence was insufficient to convict defendant of the crimes charged beyond a reasonable doubt, and that the trial court's denial of defendant's motion to continue served to deny defendant his right to a fair trial. On February 11, 2016, defendant filed a *pro se* motion for a new trial alleging ineffective assistance of counsel. The trial court denied the motions.

¶ 31 The sentencing hearing concluded on May 12, 2016. For sentencing purposes, the parties agreed that even though the jury returned guilty verdicts on five counts of aggravated criminal sexual assault, one-act one-crime principles only permitted the court to enter a judgment and sentence on two of the aggravated criminal sexual assault counts.

¶ 32 The trial court sentenced defendant to serve two consecutive terms of 50 years' imprisonment for aggravated criminal sexual assault as alleged in counts 5 and 6. The trial court also sentenced defendant to serve a consecutive term of 5 years on count 14, and a five-year term on count 15 to run concurrent with count 14. The trial court denied defendant's motion to reconsider on June 22, 2016.

¶ 33    Defendant appeals.

¶ 34                               II. ANALYSIS

¶ 35                           A. Motion to Continue

¶ 36    Defendant's first challenge on appeal concerns the trial court's denial of defendant's motion to continue, filed November 13, 2015, three days before defendant's jury trial. Defendant asserts that the trial court's denial of the motion resulted in a violation of defendant's constitutional right to a fair trial. The parties disagree on the appropriate standard of review. On one hand, the State submits the trial court's decision should be affirmed and argues it is well established that the court's ruling on a contested motion to continue is subject to the abuse of discretion standard of review. *People v. Ward*, 154 Ill. 2d 272, 304 (1992). Relying on *People v. Walker*, 232 Ill. 2d 113, 129 (2009), defendant seeks to transform the court's ruling on his motion to continue into a violation of his constitutional right to a fair trial, which requires our *de novo* review. *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 57.

¶ 37    As the State asserts, defendant's argument regarding a *de novo* standard of review is based on a misinterpretation of the language in *Walker*. The case law clearly requires this court to determine whether the trial court abused its discretion by denying defense counsel's request for a continuance. *Walker*, 232 Ill. 2d at 125. An abuse of discretion exists where the court's decision is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Kladis*, 2011 IL 110920, ¶ 23 (quoting *People v. Ortega*, 209 Ill. 2d 354, 359 (2004)). This determination ultimately rests upon the unique facts and circumstances of the case. *Walker*, 232 Ill. 2d at 125. Illinois jurisprudence provides that when deciding whether to grant or deny a request for continuance, several factors may be considered and balanced by the trial court. *Id.* These factors include, but are not limited to, "the movant's diligence, the defendant's right to a

10

speedy, fair and impartial trial and the interests of justice." *Id*. Other factors the trial court may consider include (1) whether defense counsel was unable to prepare for trial because of another cause, (2) the history of the case, (3) the complexity of the matter, (4) the seriousness of the charges, (5) docket management, (6) judicial economy, and (7) inconvenience to the parties and witnesses. *Id*. at 125-26.

¶ 38    In the interest of comparison, in *Walker*, our supreme court held that the trial court abused its discretion where the court summarily denied the defendant's motion to continue by simply stating "this has been set" without considering any of the relevant factors. *Id*. at 126. Our supreme court noted that the trial court, in that case, made no comment concerning any pattern of delay, the interests of justice, the severity of the charges, docket management, judicial economy, inconvenience to the parties, and never even afforded the defendant an opportunity to inform the court as to the length of the continuance sought. *Id*. at 126-27. Such is not the case in the instant matter.

¶ 39    Here, the trial court expressly mentioned consideration should be afforded to the seriousness of the charges against defendant and the interests of justice. Thereafter, the court carefully and systematically reviewed the entire procedural history of the case, including prior trial dates, continuances, motions, and discovery disclosures. The trial court factored speedy trial considerations into its deliberation and stated that a year had passed without a trial on these very serious charges. The court noted that the defense received the expert's final DNA report on March 26, 2015, almost eight months before the scheduled jury trial. When meticulously making a record for our review, the trial court observed that the complicated DNA evidence was no longer a significant consideration since the defense strategy did not deny sexual penetration but instead focused on the consensual nature of the encounter.

11

¶ 40 The court also took into consideration that defense counsel had vigorously litigated the case up to the date of the motion to continue. The court noted for the record that defense counsel filed a number of motions and attended many hearings over the course of the last year. The trial court balanced the victim's future unavailability due to serious medical issues, against defense counsel's assertion that more time was needed for defense counsel to investigate whether a serial rapist assaulted the victim, rather than defendant. With respect to the undeveloped evidence pertaining to a serial rapist, the court suggested the purported theory could result in a trial within a trial. Finally, the trial court was sympathetic to the fact defense counsel had recently completed another jury trial and that the public defender's office was overburdened.

¶ 41 We cannot characterize the trial court's ruling as anything other than rational, well balanced, and carefully articulated for purposes of review. The trial court's methodical approach produced a well-protected record for our review. Here, the trial court considered the vast majority of the relevant factors promulgated by the existing case law, and then some. Based on the circumstances of this case, we conclude the trial court did not abuse its discretion by denying defendant's motion to continue.

¶ 42 B. Prosecutorial Misconduct

¶ 43 Defendant next argues that the prosecutor engaged in prosecutorial misconduct when addressing the jury, requiring reversal of defendant's convictions and remand for a new trial. Defendant concedes these issues involving alleged prosecutorial misconduct were not properly preserved for review. However, defendant claims plain error excuses forfeiture because the misconduct seriously undermined the integrity of the judicial proceedings. *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010).

¶ 44　　　Specifically, defendant claims the prosecutor improperly encouraged the jurors to return a verdict based purely on emotion by making irrelevant references to the victim's family and religion, and using excessive, emotionally charged language during both opening statements and closing arguments. Further, defendant urges this court to conclude that in addition to playing on the jurors' emotions, the prosecutor improperly shifted the burden of proof by misstating the applicable law and misinterpreting several key pieces of evidence.

¶ 45　　　It is well established that the first step in any plain error analysis requires a determination of whether clear error occurred. *Walker*, 232 Ill. 2d at 124. "The ultimate question of whether a forfeited claim is reviewable as plain error is a question of law that is reviewed *de novo*." *People v. Johnson*, 238 Ill. 2d 478, 485 (2010). "A defendant seeking plain-error review has the burden of persuasion to show the underlying forfeiture should be excused." *Id*.

¶ 46　　　We first consider whether the prosecutor's remarks during opening statements and closing arguments constituted clear and obvious error. An opening statement generally serves to inform the jury of what the party expects the evidence to show, including reasonable inferences that may be drawn from such evidence. *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). Remarks made during both opening statements and closing arguments must be viewed in context. *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 47. Error occurs where the prosecutor's opening comments "are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to defendant." (Emphasis omitted.) *Kliner*, 185 Ill. 2d at 127. Further, the State is afforded wide latitude during closing argument and may argue facts and reasonable inferences to be drawn from the evidence. *Id*. at 151. Some of the prosecutor's statements during opening and closing arguments were questionable here, however, when viewed as a whole, the statements do not rise to the level of plain error.

13

¶ 47    During both opening statements and closing arguments the prosecutor discussed the fact that this victim was a religious woman that spent the day of the offense visiting her daughter, eating lunch with her mother, and visiting her aunt in a nursing home before returning home and encountering a man she did not know. We conclude the prosecution's remarks about the victim's family and her activities on the date of the offense consisted of commentary on several undisputed facts established at trial. Further, the prosecutor's focus on these facts provided a context for the jury to consider when deciding whether this 63-year-old woman consented to have oral and vaginal sex with the defendant who was half her age. When read in context, we conclude that the State's remarks in opening statements and closing arguments involved a fair prediction and then summation of the victim's testimony.

¶ 48    Similarly, the prosecutor described the victim as "a religious woman" who "even went so far as to witness to" and "pray for" defendant. The victim testified that she made these comments to comfort defendant in an effort to preserve her own life. This testimony provided context, highlighting the desperate situation of this victim. Based on this unique record, these comments concerning religion were not improper.

¶ 49    In addition, defendant takes issue with the prosecutor's usage of the terms "terror," "horror," "violence," "depravity," "brutal[ity]," "indignity," and "savage" to describe the nature of the conduct the victim endured. The prosecutor further described the circumstances the victim experienced as "horrifying" and culminated in her "humiliation" and the "ultimate indignity."

¶ 50    First, prosecutors may comment on the brutal nature of a crime if the comments are supported by the evidence. *People v. Wilson*, 257 Ill. App. 3d 670, 685 (1993). Second, defense counsel used similar terminology and made nearly identical comments regarding the evidence. It is significant to this court that *defense counsel* also described the same events with similar wording

14

such as "awful," "a nightmare" "horrible," and "unbearable." For these reasons, we find no error arose from the descriptive language utilized by the prosecutor.

¶ 51    Next, we address the prosecutor's comments concerning "the devil" and the propriety of the prosecutor's statement that "the only thing necessary for the triumph of evil is for good men to do nothing. So I ask you, good men and women of this jury, as this case leaves our hands and head[s] into yours, what are you going to do?" Defendant argues these comments improperly cast the decision of the jury as a choice between good and evil, a practice condemned by our supreme court in *People v. Johnson*, 208 Ill. 2d 53, 80 (2003). The record does not support the defense's contention on appeal.

¶ 52    First, a prosecutor may properly urge the fearless administration of justice and comment unfavorably on the evils of crime, and much like our supreme court's case in *Nicholas*, defendant's own statements and actions fit the description set forth in the prosecutor's comments to the jury. *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005). The defendant described himself as the devil, not the prosecutor. Second, the *Johnson* court did not hold that the age-old triumph over evil quotation alone constituted a very serious error as defendant suggests. *Johnson*, 208 Ill. 2d at 80. The *Johnson* court merely utilized the quotation as part of an effort to show a pervasive pattern of misconduct. As explained above, the prosecutor's references to religion were not in error, and the prosecutor's references to the devil were based on the evidence presented. We cannot say the utilization of an age-old legal quotation constituted a serious error when viewing the entirety of the case in context.

¶ 53    Defendant next categorizes several of the prosecutor's statements during closing argument as attempts to shift the burden of proof to defendant. There is no question that the defense is under

15

no obligation to produce any evidence, and it is improper to shift the burden of proof to the defendant. *People v. Beasley*, 384 Ill. App. 3d 1039, 1047-48 (2008).

¶ 54        Defendant takes issue with the prosecutor's reference to Ockham's razor during rebuttal argument; however, the prosecutor was merely addressing competing theories of the case concerning who and what to believe. As such, the prosecutor's reference to Ockham's razor had nothing to do with lessening the burden of proof. See *People v. Nieves*, 193 Ill. 2d 513, 534 (2000) (finding that prosecutors may respond to attacks on the State's evidence during rebuttal argument). The prosecutor's statements that "there's no physical evidence tying [another person] to the scene," and that "[another person's] DNA wasn't found inside [the victim]" accurately reflected the evidence presented and were permissible inferences. The prosecutor's argument that there was no problem or contamination with the DNA sample was certainly a permissible inference based on the expert's testimony at trial. The prosecutor's arguments did not result in burden shifting.

¶ 55        Defendant's final argument concerning the prosecutor's closing argument is that the prosecutor twice misstated the law regarding the elements of aggravated unlawful restraint and aggravated criminal sexual assault. First, the charge of aggravated unlawful restraint required the State to prove that defendant was armed with a "deadly" weapon. 720 ILCS 5/10-3.1(a) (West 2014). The record reveals that the prosecutor stated:

>         "Finally, the Defendant has been charged with aggravated unlawful restraint. We must prove that the Defendant detained [the victim] while armed with a *dangerous* weapon, in this case the firearm. The Defendant detained [the victim] when he duct taped her hands and her ankles while he had the gun." (Emphasis added.)

Even if we were to conclude the prosecutor's usage of the word "dangerous" instead of "deadly" technically constituted a misstatement of the law, we must view the comment in context. It appears

16

the prosecutor's use of inartful terminology on one occasion was cured. Here, the instruction the jury received informed jurors that the weapon must be "deadly" and cured any confusion caused by the prosecutor's careless word choice.

¶ 56 Defendant also contends the prosecutor misstated the law by stating:

"When he forcibly placed his penis in [the victim's] vagina she told you she hurt. The Defendant caused bodily harm to [the victim] during the sexual assault. The bodily harm to her vagina is considered bodily harm not only for the penis-vagina count but for the penis-mouth charge as well. The bodily harm to her vagina was part of a continuous unbroken series of events calculated by this defendant. The cutting off of her breathing and the Defendant tying her up so tightly that she couldn't move also qualify as bodily harm because those things were also done during the series of assault upon her by the Defendant."

¶ 57 The prosecutor's references to the cutting off of the victim's breathing and the victim being tied as occurring "during the series of assault upon her" was ambiguous. "[D]uring the commission of the offense" has been interpreted to mean that the aggravating circumstances must exist during the literal commission of the sexual assault, or, "while the offender is engaging in the conduct that constitutes the offense." See *People v. Giraud*, 2012 IL 113116, ¶¶ 4-13; 720 ILCS 5/11-1.30(a) (West 2014).

¶ 58 The prosecutor's comment could be interpreted to mean that the aggravating circumstances occurred during the sexual assault, which would be a correct interpretation of the law. However, based on the evidence presented at trial and the prosecutor's reference to a continuous unbroken series of events, the prosecutor may have misstated the law. Regardless, the jury could have, and in fact likely found that the bodily harm to the victim's vagina served as proof of the aggravating

17

factor. There can be no doubt that this harm occurred during the commission of the offense. Ultimately, when considered against the totality of the State's closing argument and the totality of the evidence, this comment cannot be said to be a material factor defendant's conviction. Accordingly, we find no clear error here.

¶ 59     In the interest of providing further context, we lastly observe that both the State and the court made several curative statements during closing argument. For example, the prosecutor stated:

"The nature of the testimony in this case was sometimes not easy to listen to and the details that you heard were graphic in nature. I assure you that neither Mr. Dickenson nor myself presented that evidence in order to appeal to your emotions but rather to present to you, the ones who will be deciding the guilt or innocence of this defendant, a clear picture of the atrocities that this defendant committed upon [the victim.]"

The prosecutor also stated:

"At the end of the day do not find him guilty because of my passion, do not find him guilty because I'm urging you to. Find him guilty because the evidence and the law demands it of you."

¶ 60     Further, the court instructed the jury that neither sympathy nor prejudice should influence their decision and that neither opening statements nor closing arguments constituted evidence. Lastly, though not dispositive here, we must note that the evidence in this case was not closely balanced.

¶ 61     As is often true during criminal jury trials, the facts of this case likely evoked a certain level of emotional reaction in each juror regardless of any statements made by the State or by defense counsel. Ultimately, the State's comments during opening statements and closing

18

arguments cannot be considered clea" and obvious error that served to erode the integrity of the judicial process. Therefore, we honor defendant's procedural default of these issues. This was not a perfect trial, but defendant is not entitled to a perfect trial, he is entitled to a fair trial, which he received in this case. *People v. Griffin*, 178 Ill. 2d 65, 90-91 (1997).

¶ 62                                    C. Sentencing

¶ 63        The trial court imposed two consecutive, extended, prison terms of 50 years for the convictions on counts 5 and 6, for a total of 100 years. Defendant argues the 2010 amendment to section 5-8-4(f)(2) of the Unified Code of Corrections raised a presumption that the legislature intended to change the law. 730 ILCS 5/5-8-4(f)(2) (West 2014). Without referencing any authority developed in the case law over the decade since the statutory amendment, defendant surmises that the legislature intended to abolish the maximum aggregate sentence of 120 years that section 5-8-4(f)(2) once permitted. Defendant relies on our supreme court's interpretation in *People v. Vincent*, 226 Ill. 2d 1, 18-19 (2007) for this assertion. See also *People v. Myrieckes*, 315 Ill. App. 3d 478 (2000). Defendant argues that because section 5-8-4(f)(2) now refers to "Article 4.5 of Chapter V," which is titled "Standard Sentencing," section 5-8-4(f)(2) no longer authorizes extended-term sentencing ranges and caps defendant's sentence at 60 years.

¶ 64        Defendant concedes he failed to preserve this issue for appellate review. To overcome procedural default, defendant requests this court either review his claims for plain error or ineffective assistance of counsel.

¶ 65        The fatal flaw in defendant's unsupported argument is defendant's assertion that Article 4.5 of Chapter V refers only to 730 ILCS 5/5-4.5-5 (West 2014), which is entitled "Standard Sentencing" and omits sentencing ranges. Contrary to defendant's position, Article 4.5 of Chapter V "sets forth the various classes of criminal offenses and the sentences authorized *** for each

19

class." *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 144; 730 ILCS 5/5-4.5 et seq (West 2014). Subsection 25 of Article 4.5 of Chapter V clearly includes extended term sentences of "not less than 30 years and not more than 60 years" for Class X felonies. 730 ILCS 5/5-4.5-25 (West 2014). After an exhaustive review, we hold that defendant's sentences comport with these statutory sentencing provisions.

¶ 66    Here, the sentence of imprisonment could not exceed the sum of the maximum terms authorized, which would be two terms of not less than 30 and not more than 60 years. Therefore, defendant was eligible for a total aggregate prison term of 120 years on counts 5 and 6. Clearly, the 100-year aggregate sentence defendant received was authorized by statute.

¶ 67                                    III. CONCLUSION

¶ 68    The judgment of the circuit court of Kankakee County is affirmed.

¶ 69    Affirmed.